UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:00CR263(JCH) |
| | : | |
| v. | : | |
| | : | |
| PATRICE ST. SURIN | : | December 10, 2007 |

### GOVERNMENT'S MEMORANDUM IN AID OF POST-*CROSBY* PROCEEDINGS ON REMAND

The Government respectfully submits this memorandum in connection with the proceedings on remand from the United States Court of Appeals for the Second Circuit relating to the Court's consideration of whether it would have imposed a non-trivially different sentence if the United States Sentencing Guidelines had been advisory at the time of sentencing.

The defendant, Patrice St. Surin, was convicted after a jury trial of conspiracy to possess with intent to distribute and to distribute fifty grams or more of cocaine base and five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. On May 5, 2003, the Court imposed a sentence of 188 months of imprisonment, followed by five years of supervised release, and fined the defendant $5,000.

The defendant appealed his conviction, which the Second Circuit summarily affirmed in an order filed on October 15, 2004. Thereafter, the Second Circuit ordered a limited remand in this case, in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Court of Appeals' decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).

## BACKGROUND

The following facts are drawn from the presentence report ("PSR"):

This case relates to the prosecution of the Burden Organization. During the course of the defendant's trial, the government presented evidence establishing that from 1998 through the spring of 2001, the defendant served as the primary narcotics supplier for a drug dealer named Ernest Eugene Weldon. Weldon typically converted the cocaine supplied by the defendant into cocaine base for resale to his customers, including members of the Burden Organization in Norwalk, Connecticut.

In the fall of 1998, Weldon was in need of a source of drugs and his friend and cousin, Thomas Holman, introduced him to the defendant. Their first drug deal consisted of the sale of 250 grams of cocaine for approximately $7000. Weldon and the defendant remained in contact and the defendant became Weldon's primary source of supply until April 2001. PSR ¶ 10.

For several months in 1998, Weldon obtained cocaine from the defendant exclusively in quantities ranging from 250 to 500 grams. PSR ¶ 10. In 1999, Weldon began obtaining drugs from multiple sources, including the defendant. During this year, Weldon purchased two kilograms of cocaine from the defendant, which Weldon and Holman sold to other drug dealers. PSR ¶ 11.

In 2000, Weldon and the defendant continued to transact narcotics business, and in the latter half of 2000, the defendant again became Weldon's exclusive source of supply. In each of these transactions, Weldon purchased quantities of cocaine from the defendant in the range of 300 and 500 grams. During this period of time through April 2001, Weldon trafficked in large

quantities of cocaine base, which he prepared using the powder cocaine he obtained from the defendant. PSR ¶ 12.

In approximately the summer of 2000, Weldon began supplying drugs to members of the Burden Organization, including Kelvin Burden, David Burden, a/k/a "DMX", and Anthony Burden, a/k/a "Tone." Weldon's first transaction involved his sale of a kilogram of cocaine to Kelvin Burden. For this transaction, Weldon obtained the cocaine from another source of supply known as Sean Delmore. PSR ¶ 13. In the fall of 2000, Kelvin Burden began serving a jail sentence, after which DMX and Tone Burden contacted Weldon near the end of October 2000, at a point when Weldon's exclusive source of supply was defendant St. Surin. Thereafter, from November 2000 to February 8, 2001, DMX and Tone Burden purchased crack cocaine from Weldon on an almost weekly basis in quantities ranging from 300 to 500 grams. PSR ¶ 14.

Pen register data revealed that Weldon and the defendant were in contact well over 100 times from November 2000 through January 2001. PSR ¶ 15. Moreover, from February through early April 2001, wire interceptions over telephones used by Weldon confirmed that Weldon was a narcotics supplier and that the defendant was Weldon's source of supply. PSR ¶ 15-16.

The PSR noted that the defendant actually purchased drugs from Weldon in April and May 2001, referencing two purchases of 62 grams of crack in April 2001. The defendant ultimately was arrested on August 7, 2001. PSR ¶ 17.

The PSR calculated the defendant's offense level as being 38, based on the quantity of narcotics involved exceeding 1.5 kilograms of cocaine base. The Government advocated for this offense level based on the conclusion that the defendant's relevant conduct should include the amounts of crack Weldon cooked and distributed from the powder cocaine he purchased from the

defendant. An offense level 38 with a criminal history category I would have resulted in a guideline range of 235 to 293 months in prison. PSR ¶¶ 23, 49.

At sentencing, the Court ultimately rejected the argument that the defendant's relevant conduct should include Weldon's crack sales, and instead concluded that the defendant had distributed in excess of 10 kilograms of powder cocaine and 124 grams of crack. Sentencing Transcript 71-72, 94-97 ("S. Tr. __.").[1] Converting those findings to a marijuana equivalency under the Guidelines, the Court determined that the defendant's total offense level was 34. S. Tr. 71. The resulting guideline range was 151 to 188 months in prison. S. Tr. 72.

The Court ultimately imposed a sentence at the top of the range – i.e., 188 months. In doing so, it noted that its quantity calculations were "very conservative." S. Tr. 95. The Court also emphasized that while it did not agree with the Government's relevant conduct analysis, it nevertheless found that the defendant knew that Weldon was converting his powder cocaine to crack and selling it in Norwalk through the Burdens, meriting a sentence at the top of the guideline range. S. Tr. 97.

## DISCUSSION

In *Booker*, the Supreme Court held that the United States Sentencing Guidelines violated the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a remedy, the Court severed and excised the statutory provision that made the Guidelines mandatory, 18 U.S.C. §3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 543 U.S. at 245. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the

---

[1] For the Court's convenience, a copy of the sentencing transcript is attached hereto.

offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id*. at 261-62.

In *Crosby*, the Court of Appeals determined that it would remand most pending appeals involving challenges to sentences imposed prior to *Booker* "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." *Crosby*, 397 F.3d at 117. In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original sentence*, if the judge had discharged his or her obligations under the post-*Booker/Fanfan* regime and counsel had availed themselves of their new opportunities to present relevant considerations." *Id*. (emphasis added). Arguments addressing factual matters that have arisen since sentencing are immaterial to the question presented. *Id*.

Sentencing in the post-*Booker* regime, as explained in *Crosby*, now involves two analytic stages: first, a determination of the applicable guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there is any reason to impose a non-Guidelines sentence. *Crosby*, 397 F.3d at 113.

The Supreme Court recently held that while a court of appeals *may* apply a presumption of reasonableness to a sentence within the applicable guideline range, such a presumption is an appellate presumption, whereas a sentencing court's decision must be based on the factors set forth in 18 U.S.C. § 3553(a). *See Rita v. United States*, 127 S. Ct. 2456, 2462-65 (2007). In

referring to section 3553(a), the Supreme Court distilled the relevant factors as follows:

> That provision tells the *sentencing judge* to consider (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) "just punishment" (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution. The provision also tells the sentencing judge to "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing as set out above.

*Id*. at 2463.

Here, there is no compelling reason why the Court should resentence the defendant. The offense of conviction subjected the defendant to a statutory mandatory minimum sentence of 10 years in prison and a statutory maximum of life. PSR ¶ 48. The PSR calculated the guideline range to be a total offense level of 38 with a criminal history category I, based on the quantity of narcotics involved being in excess of 1.5 kilograms of cocaine base. This quantity is supported by the PSR's conclusion that the defendant was responsible for Weldon's sales of far in excess of that quantity of cocaine base from the many kilograms of cocaine Weldon purchased from the defendant. PSR ¶ 19. The resulting guideline range as calculated in the PSR was 235 to 293 months. PSR ¶¶ 23, 49.

As noted, the Court rejected the argument that the defendant's relevant conduct included Weldon's crack sales, and ultimately settled on a guideline range of 151 to 188 months. But the Court took into account the fact that the defendant knew what Weldon was doing with the defendant's cocaine. This was a key factor in the Court's decision to sentence the defendant to the top of the range. S. Tr. 97.

Given that the Court sentenced the defendant to the top of the guideline range, it is unlikely that it felt constrained by the mandatory nature of the Guidelines and would otherwise have imposed a lesser sentence. Were that the case, then the Court presumably would have sentenced the defendant to the bottom of the range, not the top.

There is no argument by the defendant that the Court's calculation of the guideline range was incorrect. Indeed, the Court settled on a guideline range that was lower than the one set forth in the PSR, and the defendant did not raise any argument in his appellate brief that the Court was wrong in selecting this range.

Moreover, even though the Guidelines were mandatory at the time of sentencing, the sentence ultimately fashioned by the Court reflected an appropriate balance of all the factors set forth in 18 U.S.C. § 3553(a). The crime at issue involved a conspiracy to distribute a substantial amount of cocaine and cocaine base. The sentence therefore "reflect[ed] the seriousness of the offense, . . . promote[d] respect for the law, and . . . provide[d] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The lengthy sentence also provided "adequate deterrence to criminal conduct," § 3553(a)(2)(B), and served to incapacitate the defendant and thereby protect the public from further crimes by him, § 3553(a)(2)(C). Furthermore, the sentence allowed time for the rehabilitation of the defendant. 18 U.S.C. § 3553(a)(2)(D). As such, it addressed all the "basic aims of sentencing." *Rita*, 127 S. Ct. at 2463.

The sentence imposed was neither excessive nor greater than necessary to accomplish the goals of sentencing. The defendant was a substantial supplier of cocaine and engaged in significant transactions involving cocaine base. Indeed, the Court characterized its own quantity

determinations as being "very conservative." S. Tr. 95. In the end, the defendant's role in the conspiracy justified the sentence imposed.

## CONCLUSION

For the foregoing reasons, in conformity with the procedures outlined in *Crosby*, this Court should indicate for the record, after consideration of the defendant's sentencing range under the Guidelines and all of the factors listed in 18 U.S.C. § 3553(a), that the defendant should not be re-sentenced.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


/S/
PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT26654
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000
(203) 579-5575 (fax)

## CERTIFICATE OF SERVICE

This is to certify that I caused a copy of the foregoing to be sent to the following by first-class mail on December 10, 2007:

Bernard V. Kleinman, Esq.
Two Gannett Drive, Suite 102
White Plains, New York 10604

This is also to certify that a courtesy copy of the foregoing was hand-delivered on December 10, 2007 to:

The Chambers of the Honorable Janet C. Hall
United States District Judge
United States Courthouse
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

U.S. Probation Office
Attention: Ray Lopez, U.S. Probation Officer
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

/S/_____
PAUL A. MURPHY
ASSISTANT UNITED STATES ATTORNEY