```
1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3
     *   *   *   *   *   *   *   *   *   *   * Civil Docket
4                                         *      No. 3:00CR263(JCH)
     UNITED STATES OF AMERICA,            *
5                   Plaintiff             *
                                          * May 5, 2003
6            vs.                          * 9:34 o'clock a.m.
                                          *
7    PATRICE ST. SURIN,                   *
                    Defendant             *
8
     *   *   *   *   *   *   *   *   *   *   * Bridgeport, Connecticut
9                            SENTENCING

10              BEFORE THE HONORABLE JANET C. HALL
                  UNITED STATES DISTRICT JUDGE
11   Appearances:
     For the Plaintiffs:           BRIAN SPEARS, ESQ.
12                                 Assistant U.S. Attorney
                                   915 Lafayette Boulevard
13                                 Bridgeport, CT 06604

14   For the Defendant:           JAMES E. SWAINE, ESQ.
                                   18 Trumbull Street
15                                 New Haven, CT

16
     For the Probation Office:     Ray Lopez
17                                 U.S. Probation Officer

18

19

20

21   Court Reporter:              Thea Finkelstein RMR, CRR
                                   141 Church Street
22                                 New Haven, CT 06510

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
                            EXHIBIT A
```

1          THE COURT:  Good morning.  Please be seated.  We are

2    here this morning in the matter of the United States of

3    America versus Patrice St. Surin, 3:00CR263.

4          If I could have appearances, please.

5          MR. SPEARS:  Good morning, your Honor.  For the

6    United States, Brian Spears.

7          MR. SWAINE:  Good morning, your Honor, under the

8    Criminal Justice Act, James Swaine for Mr. St. Surin.

9          THE COURT:  Good morning, Mr. Swaine.  Good morning,

10   Mr. St. Surin.

11         I just want to state on the record what I've done in

12   preparation for today's hearing:

13         First, I've reviewed the presentence report,

14   including two addenda, I believe, which were prepared by Mr.

15   Lopez.

16         In addition, I've reviewed the defendant's

17   objections to the presentence report, as well as the

18   government's response thereto.

19         And then finally, a response by the defendant to the

20   government's submission, which came in at the end of last

21   week.

22         I just want to be sure -- I've also obviously

23   reviewed a lot of transcript of I'll say related proceedings,

24   as well as the trial of Mr. St. Surin.  Is there anything else

25   that I should have looked at that's been submitted that I've

**EXHIBIT A**

1  overlooked in listing?

2          MR. SPEARS:  No, your Honor.

3          MR. SWAINE:  No, your Honor.

4          THE COURT:  All right, thank you.  As I understand

5  it from counsel's submissions as well as statements made to

6  the probation officer, there are various issues that are

7  outstanding in the case, objections to the presentence report,

8  to put it a different way.

9          First, there's a series of statements made in the

10  presentence report to which the defendant objects as to, that

11  they're not facts or they're things that should not be

12  considered by the Court in connection with this sentencing.

13          I'll just refer to them as in the second addendum,

14  probation officer has summarized them and they're attached, as

15  I say, in the defendant's objections to the presentence

16  report.

17          Secondly, there's the issue of the defendant's

18  financial ability to pay a fine because I believe the

19  probation officer has indicated that in the absence of any

20  evidence, a fine should be imposed, and I think the defense

21  has objected to that.

22          Third, the defense, I believe, presses what I'll

23  call an Apprendi issue, which is whether, in fact, the Court

24  can make findings of quantities in excess of those quantities

25  found by the jury.

**EXHIBIT A**

1          And lastly, there is a quantity issue separate and

2     apart from _Apprendi_ which I understand the defendant to press

3     and in particular, I'm going to say the defendant presses it

4     as to findings of crack cocaine attributable to the defendant.

5          Have I fairly stated what the issues are that are

6     outstanding, I would say, from the defendant's point of view?

7          MR. SWAINE:  Your Honor, with the exception of

8     perhaps the way you've characterized the last one as a

9     quantity argument, I think I tried to clarify that with my

10    last submission at the end of the week.

11         I'm not sure we are in a position to debate the

12    quantities of base or crack cocaine that Mr. Weldon may have

13    engaged in, but we do argue that it's not relevant conduct as

14    to Mr. St. Surin.

15         THE COURT:  It's a comment fairly taken.  By

16    quantity I meant the ultimate converted to quantity, but

17    obviously the issue that you dispute is the type of drug used

18    in undertaking those quantity conversion calculations.

19         MR. SWAINE:  That's correct, your Honor.

20         THE COURT:  And I understood that, if I didn't state

21    it very clearly, but it's quite clear to me that's what your

22    issue is.

23         MR. SWAINE:  Other than that, you've articulated the

24    issues.

25         THE COURT:  All right.  And I assume -- is the

**EXHIBIT A**

1  government in opposition to the defendant on all of those

2  issues?  Is that a fair statement?

3          MR. SPEARS:  Yes, it is, as I look down the list.

4  Yes.

5          THE COURT:  All right then, let's start first with

6  what I'll call in the objections to the presentence report --

7  I guess I should state, obviously, Mr. St. Surin, you have

8  either family or friends who are here, I'm sure you understand

9  the process I'm going through, I hope you do from talking to

10  counsel, but for those persons who are here that are not

11  involved in the process themselves, the Court's required by

12  law to impose a sentence that's determined under something

13  called the sentencing guidelines and I can't do that until I

14  determine what the facts are that are relevant to the

15  calculations under the guidelines.

16          So there are various issues that have been raised by

17  the defense, as to both facts that would affect -- might

18  affect -- sentencing, and sort of legal issues that could also

19  affect the guideline calculation.  So I need to go through all

20  of those issues first, before I get to the ultimate decision

21  of sentencing.

22          Before I press on to those factual issues, Mr. St.

23  Surin, I want to be certain that you've had an opportunity

24  yourself to review the presentence report, including the

25  addenda, and to discuss it and go over it with Attorney

**EXHIBIT A**

1  Swaine.

2           THE DEFENDANT:  Well, sort of.

3           THE COURT:  What do you mean by "sort of"?

4           THE DEFENDANT:  We have issues that we still haven't --

5           THE COURT:  Absolutely.  I know you have issues.

6  All I'm asking is have you had a chance to read it and discuss

7  it?

8           THE DEFENDANT:  We have issues that we haven't

9  discussed yet that we should.

10          MR. SWAINE:  Your Honor, if I could, and I'll ask

11  Mr. St. Surin to correct me if he believes I've misstated

12  anything, Mr. St. Surin has given me some directions as his

13  counsel of things that he wanted me to obtain.  I did not, in

14  all candor, believe that they were germane to the issue of

15  sentencing; I think they're germane ultimately to his appeal,

16  and the Court knows he will, has remained adamant of his

17  innocence.

18          THE COURT:  Sure.

19          MR. SWAINE:  I think he disputes that with me, in

20  all candor, and without revealing any confidences, I think

21  that's what he's raising this morning, that there are

22  additional things that he thought we should have gone over or

23  explored, and I think that needs to be brought to your

24  attention and I guess I'm simply saying I made professional

25  decisions as his counsel that while they may ultimately be

**EXHIBIT A**

1  important, and can be important, to his appeal, I did not see

2  that they were relevant to the issues that have been put

3  before your Honor with regard to his sentencing.

4        He does take exception to my opinion in that area,

5  so he may want to articulate more clearly what those

6  differences are.

7        THE COURT:  Would you instruct him not to articulate

8  those differences for reasons that, in your judgment, it would

9  be to his, inure to his, detriment to either place them before

10  me or expose any confidence?

11        MR. SWAINE:  I don't think they relate to any

12  underlying facts or actions; I think they deal with issues of

13  my representation of him.  And again, I would ask Mr. St.

14  Surin to -- this is awkward.

15        THE COURT:  I understand, sir.  I will ask him, as

16  long as I have some comfort level from you that you don't feel

17  he's going to be harming himself, obviously he has a right to

18  remain silent.

19        MR. SWAINE:  Right.  Maybe if I gave one example.

20  I'm not even sure how comfortable -- he asked me to obtain a

21  copy, fairly some time ago, of the entire trial transcript and

22  that would include closing argument and charge to the jury.

23        And my opinion was, I wanted to focus on sentencing

24  so I got the trial transcript of the testimony but I've not

25  yet ordered closing argument, charge to the jury, which I will

**EXHIBIT A**

1  obviously for the appeal.  That's an example, I think, of

2  where he felt that was important for him to have, and I kept

3  moving on.

4        There are other -- mostly about documents, that kind

5  of thing, that we've had.

6        THE COURT:  I guess, Mr. St. Surin, I don't know

7  what the issues are you have with Attorney Swaine so I can't

8  assure you that those can be raised in another context, or

9  ought to be raised in another context.

10        On the other hand, I'm concerned, you have obviously

11  maintained your innocence throughout the proceeding and you

12  have a right to remain silent, so I don't want to suggest to

13  you that you need to tell me what these issues are that you

14  have with Attorney Swaine.

15        On the other hand, if you want to tell me, I'm not

16  going to tell you that you can't.

17        My concern, though, is you have a right to remain

18  silent and you also have a right further to keep confidential

19  whatever your conversations are with your counsel.  In other

20  words, he can't reveal them.

21        So I hesitate to ask you to tell me what are these

22  issues but, on the other hand, if you feel you want to, in

23  this context, in connection with sentencing, I'm not going to

24  stop you.  That's your choice to make.

25        Obviously, it sounds like counsel is advising you

**EXHIBIT A**

1    not to raise these issues, and counsel is quite qualified, but

2    obviously he's a little uncomfortable, too, because you

3    obviously have a different view on some of these things.

4         If you don't want to speak, what we'll do is proceed

5    and counsel will raise the various issues he's raised already,

6    we'll have arguments on them, I'll make certain findings, I'll

7    hear from everyone, yourself included, as to what an

8    appropriate sentence is, and then I'll proceed to sentence and

9    then you have your appeal.

10         But if you have issues concerning the sentencing

11   that you want to raise that counsel won't raise, I'm not going

12   to tell you that I won't hear from you but you have the right

13   to remain silent and I can't make you speak, and I'm not even

14   encouraging you to speak but I don't want to prevent you from

15   speaking if you feel you want to put something before me.

16         Do you want to confer with counsel, if you like, Mr.

17   St. Surin?

18         MR. SWAINE:  Can we have just a moment, your Honor?

19         THE COURT:  Sure, that's fine.

20         (Mr. Swaine conferring with the defendant.)

21         THE COURT:  Attorney Swaine, I don't mean to

22   interrupt, but of course I am interrupting.

23         MR. SWAINE:  I understand, your Honor.

24         THE COURT:  We need to proceed, I think.

25         MR. SWAINE:  Yes.

**EXHIBIT A**

1          THE COURT:  If a few more minutes will help, that's

2   fine, but you need to tell me how much more time it will take.

3          MR. SWAINE:  Your Honor, I am prepared to go forward

4   with the sentencing.

5          THE COURT:  Right.

6          MR. SWAINE:  I believe my client at this point does

7   not want to address the Court as it relates to the issues

8   raised before.

9          THE COURT:  All right.  Let's take up first the

10  issues you raised concerning what I would call the probation

11  officer's recitation of facts in the presentence report.

12  Picking up from your objections, I believe the first one is

13  paragraph 7 in which you complain or object, excuse me, that's

14  not the right word, that the probation officer accepted the

15  government's version of the offense and that that version

16  relies on information or evidence that has not been provided

17  to the defendant, defense counsel, or a part of the trial of

18  these proceedings.

19          First of all, I guess I would ask the government,

20  Attorney Spears, under Local Rule 10(b)(3), am I correct that

21  the government would make available to defendant and defense

22  counsel all documents available to the probation officer that

23  were not available in discovery in the case?

24          MR. SPEARS:  Yes, your Honor, and we did that.

25          THE COURT:  You did that?  All right.

**EXHIBIT A**

1          MR. SPEARS:  I sent to the probation officer on

2    August 1st the 302s and the like and copied defense counsel on

3    it.

4          THE COURT:  You said August.  Was that a misspeak?

5          MR. SPEARS:  August 1st, 2002.

6          THE COURT:  Oh, August 1st, 2002, that's fine.

7          Attorney Swaine, it seems to me under the sentencing

8    guidelines, 1B1.3 and 1B1.4, I'm not limited to trial evidence

9    in making sentencing determinations.

10          MR. SWAINE:  I understand that, your Honor.

11          THE COURT:  And that, as I understand the law, I'm

12   free -- obviously within my sound -- within principles of law

13   I'm free to make a finding regarding relevant conduct based

14   upon preponderance of the evidence here.  You would agree with

15   that as well?

16          MR. SWAINE:  Yes, your Honor.

17          THE COURT:  All right.  The Court's going to

18   overrule that objection to paragraph 7, and to the extent that

19   it reflects what evidence is relied upon as well.

20          You then make objection to a series of paragraphs, I

21   believe 8, 9, 12, 14 through 16, 18, 19, and 60.  Let's just

22   take, the first one is that paragraph 8, that Mr. St. Surin

23   was a long-time sophisticated drug trafficker who, since the

24   fall of '98, distributed more than ten kilograms of cocaine to

25   Eugene Weldon, who in turn sold it in the form of cocaine and

**EXHIBIT A**

1    cocaine base, and that also St. Surin distributed heroin to

2    Holman in the late '90s.

3         I understand your objection to consideration under

4    Chapter 1 for purposes of relevant conduct to the Weldon crack

5    cocaine conversion, and I don't believe by the Court adopting

6    paragraph 8 as a finding of fact, that I am ruling against you

7    on that issue.

8         It is a fact that was established at trial beyond a

9    reasonable doubt that Mr. St. Surin sold powder to Weldon and

10   Weldon sold crack, at least beginning in 2000.  I don't think

11   that resolves the legal issue, or the part fact, part law

12   issue that you've raised in your objection, but I do think it

13   is an accurate statement of fact.

14        MR. SWAINE:  Your Honor, I won't concede.  I

15   understand what the Court will find.  Obviously, I don't have

16   the advantage of having sat through trial.  I read the

17   transcript several times, but I will maintain my objection,

18   but I understand that the issue of the attribution of the

19   Weldon crack business is still at issue.

20        THE COURT:  Okay.  Having said that, the Court is

21   going to overrule the objection to paragraph 8 because I think

22   the Court does find that to be the fact as well-established at

23   trial.  As I say, even making that finding, I've still not

24   resolved the issue raised by defendant.

25        Paragraph 9 has to do with what I'll call sort of

**EXHIBIT A**

1  historical background, at least as the probation officer has

2  come to understand it about Mr. St. Surin.  I don't really --

3  I have no evidence in front of me other than the probation

4  officer's report.

5          I guess, Attorney Spears, I would ask you, I don't

6  think I need to make this finding in order to sentence Mr. St.

7  Surin.

8          MR. SPEARS:  I agree.

9          THE COURT:  So the Court will sustain the objection

10  to paragraph 9 -- well, I won't resolve it.  I guess that's

11  the better way to do it, I won't resolve the objection to

12  paragraph 9 because I don't believe what's in paragraph 9 has

13  a bearing on my sentencing decision, and I don't intend to let

14  it have a bearing on my sentencing decision.

15          You have an objection to paragraph 12.  Again, 12

16  goes to what Weldon was doing beginning in 2000 with the

17  powder sold to him by Mr. St. Surin, and I'm going to overrule

18  the objection because I think the record is very strong that

19  that is a correct statement of fact.

20          Actually, I would say that the record supports the

21  conclusion in the last sentence, that Weldon purchased in

22  500-gram quantities from St. Surin in this time period.  He in

23  turn sold to the Burdens in three to five hundred-gram

24  quantities but his purchases, I believe, I looked at this this

25  morning, the transcript was pretty clear that he was buying in

**EXHIBIT A**

1  half kilogram quantities from Mr. St. Surin.  So I will

2  overrule the objection to 12.

3         As to 14, 15 and 16, is the objection to those

4  paragraphs again to its implication for the finding as to

5  whether the crack of Weldon should be attributed to St. Surin?

6  Is that really the only basis?

7         MR. SWAINE:  Yes, your Honor, whether that makes a

8  basis for the Court to then find it was a joint criminal

9  activity and enterprise.

10        THE COURT:  Fine.  I'm going to overrule the

11  objections to 14, 15 and 16.  In doing so, I am not resolving

12  the issue of the Chapter 1 relevant conduct issue.

13        I believe what's set forth in these paragraphs is an

14  accurate statement of the evidence in the record which the

15  jury found credible, which the Court also found credible.

16        Paragraph 18, again I believe accurately reflects

17  credible testimony at evidence and while it is I think quite

18  supportive of a conclusion of one of the two prongs under

19  Chapter 1 of the foreseeability, which I don't think the

20  defendant's arguing about, but if he is, I'm not going to rule

21  in his favor on that.

22        I think it's pretty clear, the evidence clearly

23  shows it was foreseeable to Mr. St. Surin that his powder was

24  being converted, certainly beginning in 2000.

25        The Court's going to overrule the objection to 18

**EXHIBIT A**

1  but in doing so, again, the Court isn't necessarily overruling

2  the second of his objections under Chapter 1, that is whether

3  it's within the scope of the jointly undertaken activity.

4       Paragraph 19, again, the Court would overrule the

5  objection as to the first three sentences, because I believe

6  the record, the trial record, is very clear as to in excess of

7  ten kilograms.  In fact, I'll weigh in the record how I get in

8  excess of ten kilograms of powder.

9       It's also clear that Mr. Weldon sold in excess of

10  1.5 kilograms of cocaine base, and that most of it went to the

11  Burdens, that's also well established.  So the Court will

12  overrule the objection to those three sentences.

13       With respect to the last sentence, again, that's

14  sort of in the nature of paragraph 9, it's background,

15  history, and the Court won't resolve the objection because I

16  don't believe it affects sentencing here today.

17       With respect to paragraph 60, I believe that's the

18  probation officer's conclusions, evaluation, and the Court

19  overrules the objection except with respect to the last part

20  of the last sentence, paragraph 60, in which the probation

21  officer draws the conclusion, on the second factor under

22  Chapter 1, that it was considered part of a jointly undertaken

23  activity.

24       The Court does not at this time adopt that.  I'm

25  going to hear some argument about this first.  To that, the

**EXHIBIT A**

1    Court will sustain the objection.

2          As to the rest of 60, it is the probation officer's

3    evaluation and, to be frank, I think it's a fair evaluation,

4    but I believe it's characterized as his evaluation and in that

5    respect, it will stand in the report.

6          You also, I think, objected to 23, 30 and 49.  Those

7    all have to do with the guideline calculation, which of course

8    won't happen until I resolve the issue on relevant conduct.

9    So to me, those are in the nature of legal objections the

10   Court will get to after I make my conclusion.

11         33, paragraph 33, has to do with other criminal

12   conduct having to do with an arrest for domestic violence

13   which did not result in any conviction of any sort.  The

14   defendant objects that there's no disposition and therefore,

15   the defendant objects to my use of the facts as a basis for

16   establishing sentencing, there's no criminal history for Mr.

17   St. Surin, and that the allegations are hearsay and don't have

18   a basis in a conviction.

19         The Court will note that hearsay is useful evidence

20   at sentencing.  It can be used in a sentencing.  To be

21   perfectly frank, I don't intend to -- I will not consider the

22   facts set forth in 33.

23         On the other hand, I have no reason to reject what

24   the probation officer sets forth as what the police report and

25   Mr. St. Surin's wife reported occurred to her at that time.

**EXHIBIT A**

1          But I'm not going to resolve it because the Court

2    doesn't intend to make use of it.  You are correct, it's not a

3    criminal history, it doesn't affect the guideline calculation,

4    and it's not the Court's intention to consider it in

5    connection with sentencing.  So I'm not going to sustain the

6    objection.

7          Next is objection to the probation officer's

8    conclusion in 61.  Again, I think it's properly characterized,

9    it's his evaluation, it's not finding a fact per se.

10         Therefore, I'm going to accept it as this very

11   experienced, very capable probation officer's evaluation of

12   this defendant in form of, I guess, advice to Court or

13   analysis for the Court's use.  There's not really a finding of

14   fact to be made in that.

15         I believe that resolves all of what I'll call the

16   particular facts as they may exist in the probation officer's

17   report.  Are there any other facts set forth, or purported

18   facts set forth, in the probation officer's presentence report

19   that there is objection to?

20         MR. SWAINE:  None that are not articulated.  Thank

21   you.

22         THE COURT:  All right.  Attorney Spears, any issues

23   you have factually with the report?

24         MR. SPEARS:  No, your Honor.

25         THE COURT:  All right then.  With the exception of

**EXHIBIT A**

1    those that I commented on that I'm not going to resolve, the

2    Court, with the exception of one or two sentences that I said

3    I would not adopt, the Court adopts the rest of the

4    presentence report as the findings of fact in connection with

5    this presentencing investigation, the presentence report, and

6    then in connection with this sentencing.

7           There remains, however, I believe one further fact

8    to be found by the Court, which relates to the defendant's

9    objections under relevant conduct in Chapter 1.  While it has

10   a legal consequence, I believe that it's quite clearly a

11   factual finding, which has to do with whether the -- let me

12   just get this right paperwork in front of me -- under 1B1.3 of

13   the sentencing guidelines, relevant conduct, I'm going to

14   consider as relevant conduct conduct of Mr. Weldon in

15   distributing crack cocaine as acts that are within the scope

16   of the defendant's agreement or, as the guidelines talk about,

17   in furtherance of jointly undertaken criminal activity in

18   1B1.3(a)(1)(B).

19          I guess let's just establish some parameters before

20   we tackle this issue.  If the probation officer's report, and

21   I believe the government's position, is correct and Mr.

22   Weldon's conversion of powdered crack is attributable under

23   relevant conduct to Mr. St. Surin, my understanding is that

24   the offense level would be a 38.

25          Do you disagree with that, Attorney Swaine?

**EXHIBIT A**

1          MR. SWAINE:  I do not, your Honor.

2          THE COURT:  If, in fact, I reject the government's

3    view that -- and I find that -- Mr. Weldon's conversion of the

4    powder to crack is not attributable as relevant conduct to Mr.

5    St. Surin, it seems as if you argue he should be at a 32,

6    reflecting the jury's verdict finding that at least certain

7    quantities were present in the conduct of Mr. St. Surin, both

8    crack and powder.

9          My question to you is -- well, that then brings us

10   to what I call the Apprendi issue, I guess.  Let me ask you

11   this:  If you are wrong about that, that somehow the

12   guidelines would be driven by the jury's findings of quantity,

13   and if that's mistaken as a matter of law, would you agree

14   with me that the proper level would be a 34?  If, in fact, I

15   find ten or eleven kilograms of powder, no conversion of that

16   to crack, and somewhere in the range of 120 to 160 or 70 grams

17   of crack, which was purchased by Mr. St. Surin from Mr.

18   Weldon?

19         MR. SWAINE:  Attorney Spears for the government did

20   a drug quantity conversion.

21         THE COURT:  In his memo at page 11.

22         MR. SWAINE:  Yes, he converts, as the drug

23   equivalency table requires, everything down to a base of

24   marijuana weights, so yes.

25         THE COURT:  All right.  Let me tackle with you

**EXHIBIT A**

1   first, Mr. Swaine, then I've got a few questions for the

2   government on at least one aspect of this.   Let's talk first

3   about what I'm calling the Apprendi issue.   Isn't it very well

4   settled in the Second Circuit, if not under Supreme Court law,

5   that the Apprendi decision does not require a jury finding of

6   the quantity of drugs to be used in determining sentencing

7   guidelines?

8          MR. SWAINE:   I don't dispute the comment, that that

9   observation that in this circuit, it's well-established and

10  for purposes of this Court, other than preserving my record or

11  somebody else's record in the future, I understand that, your

12  Honor.

13         THE COURT:   All right.   Let's then turn to the other

14  issue which I think is a challenging one, and that is the

15  question of whether Mr. Weldon's conversion to the crack

16  cocaine is relevant conduct of Mr. St. Surin.

17         Why isn't a defendant like Mr. St. Surin chargeable --

18  I'm using that as a euphemism for relevant conduct under

19  Chapter 1 -- with Weldon's conversion to crack because it was

20  only through the conversion to crack that the quantities moved

21  at the level that Mr. St. Surin was selling?

22         MR. SWAINE:   I think that's first an inference that

23  we don't know about.   I think certainly if you are looking at

24  the trafficking of powder cocaine, it wasn't -- and in fact,

25  Weldon conceded he sold both, not every gram of powder cocaine

**EXHIBIT A**

1  that came into his possession did he "cook up" and traffic as

2  crack.

3          He was an illegal entrepreneur.  He was looking for

4  the best market he could find, and he happened to tap into the

5  crack cocaine market, but he also was dealing in powder and I

6  think the key is not so much his -- that the benefit, the

7  theoretical benefit, was that allows a supplier to then move

8  more quantities but shows, in fact, an independence by Mr.

9  Weldon that it wasn't jointly undertaken.

10         THE COURT:  How about, though, the telephone

11  transcripts and what I actually heard on the audio in which,

12  for example, on March 20th, Mr. St. Surin is asking Weldon:

13  How's everything?  Straight?

14         And Mr. Weldon says that that was a query as to

15  whether the conversion process was going well.

16         There's another phone call recounted at page 116 of

17  the second day, which Weldon says was again an inquiry by Mr.

18  St. Surin of how it was cooking up when he asks, how'd it

19  look?

20         Also, Weldon testified that he bought from St. Surin

21  because the quality was good, which I believe related to its

22  ability to convert.

23         Aren't those all an involvement by Mr. St. Surin in

24  sort of jointly undertaken activity?

25         MR. SWAINE:  Well, I think it's only knowledge of

**EXHIBIT A**

1    Mr. Weldon's business.  It's not an interest economically.  If

2    your Honor will recall, Mr. Weldon testified about two

3    transactions he did with Thomas Holman.

4            THE COURT:  Yes.

5            MR. SWAINE:  One got delivered to Norwalk and one

6    got delivered to Bridgeport, and he talked about how, when he

7    purchased the powder, there was an economic transaction, a

8    payment for that, that deal was then done and over with.

9            He and Holman then negotiated the sale of it back

10   out on the street.  They upped the price and they shared in

11   the profit, one time equally and one time, a little bit more

12   to Holman because he did the delivery of it.  Well, that shows

13   that the two of them were engaged in the enterprise of moving

14   the crack cocaine.

15           We also know that Mr. Weldon had an abundance of

16   powder suppliers, Iggy, New York, Toot, Nino, Adam.  So that

17   from his perspective, Weldon's, his business is to buy powder

18   cocaine whenever and wherever he needs it, and there's no

19   loyalty, there's no shared entrepreneurialism about it.

20           And the fact that you want to buy a good product is

21   true whether your end product is crack or powder because the

22   better the product, the more you can do with it.  You have the

23   potential perhaps to cut it more and boost your sales, you

24   have the potential to cook it and boost your sales as well.

25           But I think what's key here is there's no evidence,

**EXHIBIT A**

1   other than the knowledge, which is clear from the tapes.

2   There's the transcript of the tape after I believe it's

3   Sanders is arrested about law enforcement coming in and being

4   more active and you ought to get rid of your phone, and he

5   does.

6            THE COURT:  Right.

7            MR. SWAINE:  Is that promoting his business?  I

8   don't think so.  I don't think it makes him part of a jointly

9   undertaken criminal activity.  You know, I'm not arguing the

10  foreseeability because I think that is there.

11           THE COURT:  I think you are wise not to.

12           MR. SWAINE:  Right.

13           THE COURT:  Because I think, while Mr. St. Surin may

14  dispute the credibility of the testimony, there's no question

15  that Weldon was believed by the jury and he was credible and

16  that there's quite a bit of testimony in the record of Mr. St.

17  Surin's knowledge that, in fact, Weldon eventually began to

18  convert the powder into crack, including I think Mr. St. Surin

19  being in the apartment once when it was happening, talking to

20  him about it, the Adam Sanders situation, which was a sale of

21  crack that he then got caught with, which they talked about.

22           MR. SWAINE:  Correct.

23           THE COURT:  Plus even without that, given it's

24  Norwalk, you might even say foreseeability some of it's going

25  to get converted anyway, but we don't have to stretch that far

**EXHIBIT A**

1  because we have actual evidence.

2      I guess the only question I would ask you, I'm going

3  to ask Attorney Spears this as well, is any case law in which

4  this issue has been addressed?  I found a case out of the

5  Tenth Circuit, which is an unreported decision called the Kell

6  case in which a trial judge found that, in fact, someone in

7  Mr. St. Surin's position is attributable, the crack is

8  attributable to him but in there, the appellate court reviewed

9  that on a pretty strict standard of discretion to the lower

10  court and factual findings but there, there was a telephone

11  intercept conversation where the defendant, in effect, offers,

12  there was a problem with conversion, the buyer wasn't getting

13  a very good rate of conversion and at some point on a phone

14  call, the defendant, in effect, says:  Look, if it's not

15  coming out well, call me and I'll come over.

16      And it's not expressly stated but it's pretty easy

17  to infer he was offering to help him cook it, if he continued

18  to have problems, because his having problems with the bad

19  conversion rate was causing problems for the supplier in

20  getting paid and selling more.

21      But other than that case, which I'm sure you would

22  distinguish, I'm sure the government will have a different

23  opinion about whether it's distinguishable but put that case

24  aside, it's incredible to me that there has not been a case

25  yet addressing the issue of the type of drugs in the

**EXHIBIT A**

1   downstream distribution, and what's attributable not for

2   conspiracy law purposes but for relevant conduct purposes.

3          And, you know, you read the commentary, there's

4   lovely examples about quantity attributions, but really not a

5   whole lot of help on the type of drugs.

6          So I guess my last question to you, Attorney Swaine,

7   is whether you've done better than we have and can tell me any

8   cases you've found that address the issue.

9          MR. SWAINE:  I haven't, your Honor.  I just sort of

10  pull out from various cases language that I think is helpful

11  with regard to involvement, depth of involvement, benefit but

12  they're not even necessarily directly related to this

13  particular interest.

14         The Martinez case in this circuit, for example,

15  talks about once you get passed foreseeability, you look to

16  the benefit, what benefit from the activities of this other

17  individual.

18         I think here, what's absent is what's important, is

19  that there aren't -- there isn't -- evidence of cooking or

20  finding customers or -- as ludicrous as it may sound, and I

21  was again thinking about it last night, if this is a jointly

22  undertaken enterprise, why, in May of that year, did Mr. St.

23  Surin have to go back to a so-called joint enterprise partner

24  and purchase two small quantities of crack?  He would have

25  just said, it's mine, I'm involved in it, give me a couple.

**EXHIBIT A**

1   But it shows the independence that Weldon had, his own

2   parameters.

3           And I think what your Honor said a moment ago is

4   true, it's one thing to talk about the definition of who's a

5   co-conspirator and what's the breadth of the conspiracy once

6   you get involved, but in terms of the impact or relevant

7   conduct, when the nature of the substance changes, I think it

8   significantly changes, it's different.  Here, it's knowledge

9   on the part of Mr. St. Surin, what your Honor said about,

10   well, if Weldon sells more, then St. Surin can sell more.

11   That's true of any supplier situation and obviously, Mr. St.

12   Surin was found guilty by the jury in trafficking and they

13   believe that he wanted to profit from that and move as much as

14   one could do.

15           But I think once you get into a situation where

16   there is the change in the inherent nature of the substance

17   and one under the federal sentencing guidelines so radically

18   impacts the sentence, I think there's got to be something more

19   significant than what we see here today.

20           THE COURT:  All right.  Well, I have a few questions

21   for the government, Attorney Swaine, so if you will let me

22   turn to Attorney Spears.

23           Let me just lay out, Attorney Spears, a few what I

24   think are facts, and I want you to tell me if you disagree

25   with me, okay?

**EXHIBIT A**

1           First of all, that Mr. St. Surin only ever sold

2    powder.

3           MR. SPEARS:  Well, I would disagree --

4           THE COURT:  I'm sorry, to Weldon.

5           MR. SPEARS:  I agree with that.

6           THE COURT:  Okay.  That all of the defendants in the

7    292 case, which obviously the government chose not to

8    prosecute Mr. St. Surin in the 292 case but he was a defendant

9    originally in that case in a conspiracy, that all of the

10   remaining defendants in that case, I think all of them pled,

11   if I recall.

12          MR. SPEARS:  Correct.

13          THE COURT:  I guess Mr. Holman, we had a lot of

14   hearings but that wasn't a trial, that they all pled to

15   powder, is that correct?

16          MR. SPEARS:  That's correct.

17          THE COURT:  Okay.

18          MR. SPEARS:  Offhand, your Honor, I think -- I'm

19   questioning Jeffrey Lockhart -- and my recollection is I think

20   he was powder.

21          THE COURT:  All right.  We'll try to connect that.

22   I thought they were all powder but that's why I'm asking, to

23   see if my memory's wrong.

24          That the one transaction that Mr. St. Surin was

25   involved in that involved crack cocaine was a purchase from

**EXHIBIT A**

1   Mr. Weldon.

2          MR. SPEARS:  Yes, your Honor.  As I understand it,

3   there were two.

4          THE COURT:  Two, I'm sorry, there were two.  You are

5   absolutely right.  Actually it's a little unclear to me but I

6   don't think it makes any difference, as to whether there were

7   two purchases of 62 grams each or whether there was one

8   62-gram purchase and one 25-gram purchase.

9          MR. SPEARS:  Right, I saw that in the transcript,

10  too.

11         THE COURT:  I believe it looks like 187 grams.

12         MR. SPEARS:  That's correct.

13         THE COURT:  Probation officer's report reflects 124.

14  My understanding is it makes no difference in the quantity

15  calculation.

16         MR. SPEARS:  That's correct.

17         THE COURT:  Okay.  So I'm not going to resolve that.

18  I guess I'll rely on the probation officer's, clearly it's

19  supported by the evidence, 124, so that's what I'm going to

20  find.

21         Do you also agree with me that Weldon and St. Surin

22  weren't partners?  I don't know that I have to use that word,

23  but just to move it to the specific.  In other words, they

24  didn't share in each other's profits either way.  In other

25  words, St. Surin didn't share in Weldon's, Weldon didn't share

**EXHIBIT A**

1    in St. Surin's.

2              MR. SPEARS:  I don't agree with that, your Honor.

3              THE COURT:  You don't?  Tell me why not.

4              MR. SPEARS:  Government's Exhibit 703 talks about --

5    I'm going to give you the context of this call.

6              THE COURT:  Yes.

7              MR. SPEARS:  Weldon receives a call from Sean

8    Delmore and there's some question about whether Delmore is in

9    a position to supply Weldon.  Weldon then has conversation

10   about this with Sanders and eventually talks to St. Surin, the

11   defendant.

12             And in the course of that call, which is in February

13   of 2001, Weldon says:  "You know, we together, Watty."

14   Referring to the defendant.  "We together."  I think it's very

15   significant.  He says, "I ain't going against the grain,

16   brother."

17             And the context of this call, and he testified, was

18   that this defendant was his primary supplier.  Yes, he had

19   other suppliers but they were together, when they could be,

20   they worked together.  So I would offer that as one example.

21             Another example, your Honor, I think this goes

22   really to the heart of the matter, and I get this language

23   from the Studley case, which is:  Did this defendant have a

24   stake in Weldon's operation?  One of the things about the

25   Studley case that was absent and therefore, the relevant

**EXHIBIT A**

1  conduct analysis didn't extend to the conduct of other people

2  there, was the absence of the defendant having a stake in the

3  operation as it related to the other defendants.

4        So the question is what stake did this defendant

5  have in Weldon's sale of crack cocaine?  And I would submit it

6  works this way:  He is fronting the narcotics to Weldon, so

7  that he has a very significant stake in what happens to those

8  narcotics, and whether Weldon is actually able to pay him for

9  the drugs that have been fronted, and the testimony was that

10 after the first or second transaction in 1998, the

11 relationship between these two was one where this defendant

12 was fronting the drugs to Gene Weldon, as a result of which he

13 had a stake in Weldon's sales because otherwise he wouldn't

14 get paid.

15        THE COURT:  Can you tell me where in Studley the

16 concept of stake comes in?

17        MR. SPEARS:  Yes, your Honor, on page 576.

18        THE COURT:  I just want to see where the word

19 "stake," what the context is of that phrase, that word.

20        MR. SPEARS:  Yes, your Honor.

21        THE COURT:  Which paragraph is it?

22        MR. SPEARS:  The last paragraph before the

23 conclusion.  It's the third sentence, "no interest."  Maybe I

24 shouldn't use the word "stake."

25        THE COURT:  I feel better, though, that it's not

**EXHIBIT A**

1    there because I didn't remember the case from a "stake" point

2    of view.

3              MR. SPEARS:  Had no interest in the success of the

4    operation, is the language I'm focusing on.

5              THE COURT:  But that somewhat begs the issue of what

6    the operation is.  I mean, clearly, he has an interest, Mr.

7    St. Surin, under the defendant's own view.  He doesn't concede

8    it happened, I meant the legal argument made by counsel, he

9    has an interest in the success of the operation between

10   himself and Mr. Weldon, meaning he wants to sell to Weldon.

11             MR. SPEARS:  I don't think that relates to the

12   conduct of others.  That would be --

13             THE COURT:  Absolutely.

14             MR. SPEARS:  The question is, does he have an

15   interest in what Weldon does afterwards.

16             THE COURT:  That's what I'm saying, is that phrase

17   begs the question because it depends on what the operation is

18   we are talking about, and that I think Studley tells us what

19   the language in Studley, which of course is factually entirely

20   off the mark from what I have in front of me, but it talks

21   about designing or developing the scam at issue in that case.

22             Did he work in any way to further the scheme, you

23   know, in other words, in this instance, it would be Weldon's

24   selling of the crack, did he work in any way to further that?

25   That's where I think Kell perhaps has facts that are a little

**EXHIBIT A**

1    bit different because although it's very thin, there is a

2    nugget there of this supplier's going to help the guy cook it,

3    if he's having such trouble.  That's furthering that cooking

4    effort, I guess.

5             I don't think we have anything in the record of Mr.

6    St. Surin explaining to Weldon how to cook it, how to cook it

7    better, giving him instructions, or helping him cook it, do

8    we?

9             MR. SPEARS:  No, but he --

10            THE COURT:  He was present.

11            MR. SPEARS:  And the quality of what he was

12   supplying to Weldon, knowing what he was doing with the

13   narcotics.

14            THE COURT:  But he may have wanted to know that

15   because maybe he could have charged more for it or, I don't

16   know, maybe he would then know that, then he knows that his

17   suppliers could be trusted instead of looking for a different

18   supplier.  That could be just to further his own operation,

19   meaning between himself and Weldon.

20            MR. SPEARS:  Another point --

21            THE COURT:  I'm sorry, I have one more fact I want

22   to be sure I have right because it affects my thinking

23   somewhat.  My understanding of the record at trial, my

24   understanding generally, Mr. Weldon's activities, put it that

25   way, is that this defendant and Weldon did transactions in the

**EXHIBIT A**

1   '98-'99 time period, some in sizeable quantity, but that at

2   that time, Weldon was doing powder sales himself.

3           MR. SPEARS:  As I read the transcript, that's the

4   way I read it as well.

5           THE COURT:  Okay.  There came a time in the 2000

6   period, and maybe as a result of the Burden demand, I'm not

7   quite exactly sure what triggered it but that was my sense,

8   it's not terribly important to Mr. St. Surin's case, but my

9   sense was for that reason, Weldon learns how to, decides to,

10  whatever, begins to convert it into crack in the 2000 time

11  period, right?

12          MR. SPEARS:  Yes.

13          THE COURT:  And this defendant continues to supply

14  him powder, which he then converts.

15          MR. SPEARS:  Right.

16          THE COURT:  As he had been supplying in powder up to

17  that time that Weldon didn't convert but sold as powder.

18  Okay.

19          I'm having difficulty with the concept under the

20  guideline of jointly undertaken criminal activity if, in '98,

21  when they first deal with each other -- maybe they knew each

22  other before, but they begin a relationship, buyer-seller at

23  least in '98, it's all powder, coming into Weldon and going

24  out of Weldon, okay?

25          MR. SPEARS:  Yes.

**EXHIBIT A**

1          THE COURT:  Clearly, the jointly undertaken criminal

2    activity, even in your view, at that time was just powder,

3    right?

4          MR. SPEARS:  Right.

5          THE COURT:  Okay.  Tell me what I would look to in

6    2000, that because Weldon decides to change his operation and

7    convert, would show that this defendant jointly undertook that

8    criminal activity.  In other words, I don't see any change in

9    Mr. St. Surin's conduct as evidence on the record in front of

10   me in 2000 that has him, in effect -- I understand we can have

11   implicit agreements, but it's not like from day one Weldon was

12   doing crack, from which I might draw certain inferences about

13   Mr. St. Surin, or it's not as if something in 2000 happened

14   involving Mr. St. Surin that I could draw some certain

15   implicit agreement.

16         MR. SPEARS:  Well, one thing that does happen, I

17   think the record bears this out, is that the defendant

18   becomes, again, Weldon's exclusive supplier so that at a point

19   where Weldon is now transacting business with the Burdens and

20   providing them exclusively with crack, a fact that Mr. St.

21   Surin was aware of, that sequence of events coincides with him

22   now using St. Surin as his exclusive source of supply.

23         And actually, the record is also clear that that

24   mattered to the defendant because he talks -- this is around

25   the time of February 10th, I believe, February 8th, actually,

**EXHIBIT A**

1    this is Government Exhibit 721.1, he, the defendant, and

2    Weldon talk about this 500-gram transaction that's going to

3    occur.

4            Weldon says:  Someone just hollered at me.

5            St. Surin says:  How big?

6            Weldon says:  Halfway, they want it halfway.  It was

7    what's his name, you know who I wanted to get.

8            And St. Surin says:  Ah Tone -- referring to Tony

9    Burden.

10           That shows this defendant has an interest in that,

11   that he knows that one of Weldon's biggest suppliers is now in

12   the market for 500 grams and that those narcotics are going to

13   ultimately be sold in the form of crack cocaine.

14           So I guess in answering your question, it may start

15   as a narcotics conspiracy that is about powder cocaine but

16   focusing on that time in 2000 through February 2001, it is

17   predominantly a crack operation.

18           This defendant's well aware of it, he's profiting

19   from it and actually, isn't going to get paid until Weldon

20   gets paid from his crack customers.

21           THE COURT:  That was true when he sold it to him and

22   Weldon sold powder.  I mean, I guess what I'm trying to find

23   out is you draw significance from the exclusivity relationship

24   that arises in 2000.

25           MR. SPEARS:  And confirmed when he says, we

**EXHIBIT A**

1  together, I'm not going against the grain.  This is their

2  operation.

3       THE COURT:  But is there anything that connects that

4  decision by Weldon to look to Mr. St. Surin alone to Weldon

5  beginning to convert to crack?  I mean, I understand vaguely

6  it's all related, but I don't remember any connect of, well,

7  okay, I'm going to start cooking up crack and I want to sell

8  crack and you've been giving me this great stuff so if you

9  keep giving me this great stuff, I'm going to stay with you

10  alone.  I don't have that sense.

11       MR. SPEARS:  Reading the transcript, I think

12  Weldon's need to do business with this defendant, a point

13  where he's supplying the Burdens with crack, is related to the

14  fact that this defendant was providing him with the right kind

15  of product so that he could do that.

16       And Weldon testified about that, about the fact that

17  the quality of this defendant's cocaine allowed him to,

18  allowed, I'm using the phrase jump back is I think what Weldon

19  testified about.

20       THE COURT:  But is there any evidence, other than

21  supplying Mr. Weldon with powder, that this defendant did

22  anything to further this larger jointly undertaken activity

23  that the government claims, which was crack?

24       MR. SPEARS:  I would submit that there are, in terms

25  of other evidence of togetherness would be Adam Sanders gets

**EXHIBIT A**

1   arrested and your Honor alluded to this already, this

2   defendant finds out about that and instructs Weldon, watching

3   you, get rid of your phone, Weldon follows the instructions

4   and changes the phone number.

5          THE COURT:  I thought about that, actually, and I

6   thought I was going to press defense counsel about that but

7   the more I thought about it, the phone he tells him to get rid

8   of is the phone that he's on with Weldon talking about powder

9   transactions.  In other words, it isn't -- to me, I don't

10  think it establishes an involvement, an interest, in the crack

11  transactions or the crack activity merely because this

12  defendant says get rid of the phone you and I have been doing

13  our powder deals on.

14         MR. SPEARS:  Right, he doesn't say that but that's a

15  fair inference.

16         THE COURT:  Anyway, I had thought about that as a

17  troublesome issue for defendant and thought more about it.  It

18  could be what you are arguing but it could just as well be

19  consistent with behavior of a powder conspiracy because that

20  phone was clearly the one which you folks got all of the tapes

21  about, all the transactions between Mr. St. Surin on the

22  powder.

23         MR. SPEARS:  Right.  Your Honor, I know that we

24  don't want to go into the question of knowledge and

25  foreseeability necessarily because I think it's a foregone

**EXHIBIT A**

1    conclusion, but by the same token, I think it matters because

2    with respect to what is the jointly undertaken activity, I

3    mean, I don't think it's insignificant that this defendant was

4    well aware of the fact that Weldon was supplying the Burdens,

5    that he was fully aware of his involvement in crack cocaine,

6    his need for good quality, and all of that.  So I know we are

7    not really going into that second prong, but I think it has to

8    be --

9         THE COURT:  Well, we should talk about it because

10   again, to me, there's overwhelming evidence on foreseeability,

11   okay?  I agree with you.

12        MR. SPEARS:  It's really beyond -- it was knowledge,

13   really.

14        THE COURT:  Right.  Knowledge.  That's right.

15   Clearly foreseeability's satisfied, there was knowledge.

16        The difficulty, though, and it doesn't really affect

17   the second element consideration directly, but I guess I'll

18   just tell you the two things that are kind of intertwined, I'm

19   not going to articulate them very clearly, but what makes this

20   a very difficult issue in my opinion, putting aside the fact

21   that there's no precedent on it, I guess you should tell me

22   whether I've missed any cases on point under 1B1.3 on relevant

23   conduct.

24        MR. SPEARS:  I, too, came across the Kell, there's

25   another unreported case along those same lines, *United States*

**EXHIBIT A**

1   *versus Duffy*, D-U-F-F-Y.

2          THE COURT:  Out of what circuit?

3          MR. SPEARS:  It's a Fourth Circuit case in which

4   this defendant, Jones, was a cocaine supplier and the ultimate

5   crack cocaine that was sold was attributable to him.

6          THE COURT:  I apologize, I don't think I looked at

7   that one.

8          MR. SPEARS:  I can give you the WestLaw cite, 2002

9   WestLaw, 376320.

10         THE COURT:  Okay.  We have been able to track down

11  the 292 case, and Lockhart pled to powder.  You may have had

12  evidence of base on him but he pled to powder.

13         I want to take a quick look at the *Duffy* case, I

14  apologize, I did not look at that one.

15         I guess what I'm focused on is that the commission

16  and Studley, as the Second Circuit made clear that the

17  commission in Chapter 1 says there are two aspects to relevant

18  conduct, and where I think many courts for several years sort

19  of saw foreseeability knowledge that equals jointly

20  undertaken, therefore it's relevant.  Studley makes it clear

21  no.

22         That's the first step, but there's a Second Circuit

23  so I guess I'm caught up by Studley in the sense of it's so

24  clear, the foreseeability element is reached, but there's no

25  question that Studley, and I think Chapter 1 requires me to

**EXHIBIT A**

1    make a separate finding, particularized finding, on this

2    second element, which is different than knowledge and

3    foreseeability.

4          What I'm trying to say is that where you might have

5    thought that knowledge or foreseeability, together with

6    conduct, like a downstream distribution network, was relevant

7    conduct pre-Studley, I think pre-Studley says stop, you've got

8    to focus on was it in furtherance of the jointly undertaken

9    activity.

10          MR. SPEARS:  Right.

11          THE COURT:  So I'm very cautious about --

12          MR. SPEARS:  I appreciate that, your Honor, because

13    I have litigated in Second Circuit the absence of findings on

14    two occasions.

15          THE COURT:  Which you don't want to do again.  All

16    right.

17          MR. SPEARS:  In regard to one of those cases, I

18    should point out it was a similar scenario, it was a case

19    arising out of the Segura case, the defendant's name was

20    Oswaldo Rodriguez and he ended up being a middle man between

21    Rudolfi Segura and Carlos Davila.  Rodriguez was accountable

22    for 1.5 kilos of crack cocaine because what he was doing was

23    getting the powder cocaine from Segura and then giving it to

24    Carlos Davila, who he knew was converting it to crack and

25    selling it as crack.

**EXHIBIT A**

1          So I would submit that that case is analogous, it

2    was affirmed by the Second Circuit.

3          THE COURT:  Was the issue -- the issue wasn't

4    written on, though, by the Second Circuit, was it?

5          MR. SPEARS:  No, it was not.

6          THE COURT:  Let me finish my thought of what's

7    causing me to hesitate here.  The other thing that's affecting

8    my thinking, which is why all the examples that the commission

9    gives, looks like there's so much help in the commentary but

10   none of it is really terribly helpful, I find, because none of

11   it focuses on the fact that Congress, in statute and the

12   guidelines in guidelines, treats drugs differently.

13         So there's no question, on a superficial -- not even

14   superficial -- that this defendant engaged in jointly

15   undertaken criminal activity and that he supplied an illegal

16   substance to Mr. Weldon to sell as an illegal substance, okay?

17   The jointly undertaken activity was to distribute drugs and

18   the fact that Mr. Weldon sold drugs certainly could be argued

19   to be part of the jointly undertaken activities.

20         Clearly, I don't think Mr. St. Surin wanted Mr.

21   Weldon to sit on it, but I suspect Attorney Swaine might have

22   an argument about that one.  But let's assume I went that far

23   with you.  The commission has drawn a distinction in the

24   guidelines between the type of drugs.

25         For example, in all these examples, in the

**EXHIBIT A**

1    guidelines, where they talk about the specific objective of

2    the criminal activity, it would be very easy for me to say,

3    the specific objective was the distribution of an illegal

4    substance and, okay, he did it in the form of crack, fine,

5    we'll charge crack to Mr. St. Surin.

6          But I think that begs the question.  I think I've

7    got to find what was the specific objective of Mr. St. Surin's

8    criminal activity with Weldon?

9          MR. SPEARS:  Which was to provide Weldon with the

10   raw materials so that he could run his business.

11         THE COURT:  Well, but he sold for a long time, he

12   sold it in the raw material form, and Mr. St. Surin didn't

13   say, gee, Eugene, why aren't you out there making this into

14   crack?  We would move more.  Or why aren't you out there

15   cooking it?  You will make more money and then I can charge

16   you more.

17         We don't have that.

18         MR. SPEARS:  I guess where I get stuck, your Honor,

19   is just on the basic principle that, you know, in terms of

20   assessing the culpability of Weldon and this defendant, this

21   defendant is supplying, knowingly supplying, him with the raw

22   materials so that he can run his crack operation.

23         THE COURT:  Right, but did this defendant --

24         MR. SPEARS:  Culpability, I can't imagine we need to

25   entirely divorce that question from our analysis under the

**EXHIBIT A**

1    relevant conduct provision.  Culpability wise, it stands to

2    reason that the person supplying the raw materials to someone

3    so that person can then -- that person, Weldon, can run his

4    crack operation shares in the culpability of that, of those

5    end sales.

6              THE COURT:  The other difficulty I'm having is

7    there's this conspiracy law, and then there's relevant

8    conduct.  Would you agree those aren't the same?

9              MR. SPEARS:  I would.

10             THE COURT:  What you just articulated caused me

11   pause because there's no question on a conspiracy liability

12   basis that he's in a conspiracy but to me, the commission has

13   told me that relevant conduct analysis is different than that.

14             MR. SPEARS:  But usually, that's in the flip

15   situation where you have a nonconspiracy case.

16             THE COURT:  I understand.

17             MR. SPEARS:  And you are using the relevant conduct

18   concerted activity conversion to apply to someone not

19   convicted of a conspiracy.  Here, there's no question it's

20   concerted conduct between St. Surin and Weldon.

21             THE COURT:  Because of the peculiar facts here, he

22   was charged with a conspiracy to distribute crack cocaine and

23   powder cocaine, right?

24             MR. SPEARS:  Correct.

25             THE COURT:  The jury found him guilty of both.

**EXHIBIT A**

1          MR. SPEARS:  Correct.

2          THE COURT:  However, he could have been convicted of

3   that conspiracy count if all the jury heard was powder,

4   correct?

5          MR. SPEARS:  Correct.

6          THE COURT:  We had this on the charge.  Even though

7   it's indicted as an "and," it's really an "or," right?

8          MR. SPEARS:  That's correct.

9          THE COURT:  We have the peculiar facts or evidence

10  in this case of crack coming in against the defendant in the

11  form of purchases by the defendant from Mr. Weldon so, yes,

12  there was a conspiracy to distribute crack cocaine involving

13  Weldon and this defendant, right?

14         MR. SPEARS:  Right.

15         THE COURT:  That could be the basis for the jury's

16  finding.

17         MR. SPEARS:  Although the verdict form -- I wish I

18  had it at my fingertips -- reads in terms of agreement and

19  foreseeability on that particular -- on both questions,

20  actually.  I apologize for not having that at my fingertips

21  but my recollection is the verdict form is interestingly

22  somewhat consistent with the 1B1.(3)(a)(1)(B) analysis.

23         THE COURT:  We the jury unanimously find that it was

24  reasonably foreseeable to Patrice St. Surin the conspiracy

25  charged in Count Twelve involved the following quantity of

**EXHIBIT A**

1    cocaine base:  50 grams or more.

2         If I had asked, if the jury bought your argument

3    here on relevant conduct -- I'm sorry, 50 was the most for

4    statutory purposes.

5         MR. SPEARS:  Right, but they already found the

6    agreement, and the question of quantity goes to the

7    foreseeability which I guess is not helpful, that's the second

8    prong which we are not stuck with.

9         THE COURT:  No criticism, but I don't think that

10   helps me.  I agree with you that normally, relevant conduct is

11   a smaller subset of the conspiracy found but here, I think the

12   record, the peculiarity of the facts of the purchase back of

13   crack which satisfy the quantity that the jury found satisfies

14   both for Apprendi purposes as well as conspiracy purposes, can

15   explain the findings about the crack without it being a

16   finding by the jury that this defendant's in a conspiracy to

17   distribute crack cocaine with Weldon, I guess.

18        MR. SPEARS:  I agree.

19        THE COURT:  Let me see if there's anything else.

20        Your comment about conspiracy law was bothering me.

21   As I thought about this over the past week, myself, I was

22   thinking sort of, well, he's really in this large conspiracy

23   in 263, that's what he was convicted of.

24        However, the commentary in paragraph 2 at the end of

25   example 8 talks, it says the example of four people

**EXHIBIT A**

1   backpacking quantities of marijuana from Mexico and whether

2   you are going to count all four liable for the total quantity

3   or only each what's on their back.

4          At the end of that example, there's language, it

5   says:  In cases involving contraband, the scope of the jointly

6   undertaken criminal activity may depend on whether, in the

7   particular circumstances, the nature of the offense is more

8   appropriately viewed as one jointly undertaken criminal

9   activity or is a number of separate criminal activities.

10         There, they meant separate as to W, X, Y, Z people

11  separated but here, it seems to me I can have an overarching

12  conspiracy to distribute crack and powder in Norwalk

13  ultimately that can involve, in effect, what this talks about

14  as separate criminal activities, pieces of that overarching

15  conspiracy, for purposes of relevant conduct where the

16  defendant doesn't get charged with all of it.

17         MR. SPEARS:  I'm not sure I agree with that.  Those

18  would be overt acts, each furthering the same conspiracy.

19         THE COURT:  But that's the conspiracy law analysis.

20  In other words, in this example of the four people walking

21  over the border, the supplier and the four of them would be

22  properly chargeable as having been involved in a conspiracy to

23  import marijuana into the United States, in the total quantity

24  imported, and the supplier would be liable under Chapter 1 for

25  all of the quantity but the four individuals, depending on the

**EXHIBIT A**

1    facts, I mean here, the example is they are all responsible

2    because they were helping and supporting one another but if

3    they had all taken off a mile separate from each other from

4    the border and walked separately, you might say, no, they're

5    only liable for what they carried, even though they're guilty

6    of a conspiracy to distribute four times as that or import

7    four times of that.

8         MR. SPEARS:  That analogy seems to talk in terms of

9    the supplier being responsible for all of it, which I would

10   submit that's the more analogous circumstances, this defendant

11   as the supplier.

12        THE COURT:  Right.  The problem, where the

13   guidelines are unhelpful, is all the examples of controlled

14   substances have to do with quantity issues, which clearly the

15   supplier is the start of all the quantity and it may break

16   down into trees, roots of separation but it's all traceable to

17   the supplier and that's why, in all these examples, the

18   supplier gets hit with all of it.

19        Here, however --

20        MR. SPEARS:  I understand the --

21        THE COURT:  -- it's almost the reverse of the four

22   guys walking across the border.  Let's assume that instead of

23   converting powder to crack, which led to a different penalty,

24   okay?  We were talking about when you took powder and

25   converted it to crack, you got ten times more quantity.

**EXHIBIT A**

1    Penalty remained the same, ounce is an ounce or gram is a

2    gram, but you got more, all right?  Ten times more.

3            Now, Mr. St. Surin chooses to deal only in powder

4    and he gives it to Weldon and he knows Weldon wants to make it

5    ten times as much but he doesn't tell him how, he doesn't

6    profit from the increase of the ten times, he doesn't assist

7    him in making the ten times, he doesn't, you know, in effect

8    walk across the border with it.

9            It really is the flip, it's like turning the spy

10   glasses backwards.  It's smaller at the top and bigger at the

11   bottom.  When it's the other way around, you don't make those

12   four guys responsible for each other unless they worked

13   together.

14           And what I'm troubled about here is the lack of a

15   record that even by a preponderance standard would establish

16   that he's really in -- I'm mixing metaphors up the wazoo here

17   but he's in effect, he really is, helping him row that boat to

18   increase the quantity ten times.

19           MR. SPEARS:  Then I go back to the wiretap

20   transcripts.  I keep going back for this.

21           THE COURT:  No, keep going back.

22           MR. SPEARS:  Where Weldon says, we are together,

23   Watty.  I'm not going against the grain.

24           And where the series of transactions is occurring in

25   that time frame are to Weldon's biggest customer, the Burdens,

**EXHIBIT A**

1    and it's all crack, and this defendant knows that.  It just

2    doesn't strike me as unfair or against the principles in the

3    guidelines to attribute the crack cocaine quantities to this

4    defendant, integral aspect of that process.

5           And he was, as Weldon put it, we together, you know,

6    they were together.  That was the exclusive source of supply,

7    fully cognizant of the nature of the drugs being sold.

8           THE COURT:  Clearly, they're together even in the

9    view of the case of Mr. Swaine.  I mean, they were together as

10   supplier and buyer.

11          MR. SPEARS:  True.

12          THE COURT:  And cognizant of the ultimate use is

13   only the first of the two crimes.

14          MR. SPEARS:  But I would submit that you can't have

15   a jointly undertaken activity necessarily if you don't know

16   what that activity is.  So the knowledge, that's why I say the

17   knowledge, clearly goes to foreseeability.  It's not entirely

18   separate from the analysis of whether there was an agreement,

19   a jointly undertaken activity, a meeting of the minds.

20          THE COURT:  Right.  But if all I have is knowledge,

21   is it your argument that I can then infer an implicit

22   agreement?

23          MR. SPEARS:  No, there has to be more than

24   knowledge.

25          THE COURT:  Right.

**EXHIBIT A**

1          MR. SPEARS:  And couple that with the fact that

2     again, this defendant doesn't get paid unless Eugene Weldon

3     successfully is able to sell those drugs, I think you would

4     have in that combination of knowledge and interest in the

5     success of Weldon's operation relevant conduct that includes

6     the crack cocaine.

7          THE COURT:  Well, but he got paid in '98 and '99,

8     when all Weldon sold was powder.

9          MR. SPEARS:  That's true, your Honor.  This is an

10    evolving --

11         THE COURT:  It is.

12         MR. SPEARS:  -- but clearly Congress made the

13    determination that him making money off of crack is worse, and

14    that's what he's doing.  He was making money off of powder,

15    that's true, but it evolved to a point where it became a more

16    egregious offense.

17         THE COURT:  But that's just all you've satisfied is

18    the knowledge part or foreseeability of when you make that

19    argument.

20          In other words, you are saying that any supplier who

21    knows his product becomes crack, Congress meant to punish ten

22    times.  And the commission has said, no, the commission has

23    said there are two things that have to be found, there has to

24    be foreseeability -- in this case, knowledge -- and jointly

25    undertaken activity in furtherance of specific objective of

**EXHIBIT A**

1    the criminal activity.

2         MR. SPEARS:  Right.  Supplying the raw materials to

3    me just coupled with the payment, combination of that with the

4    fact that he's fronting the powder.

5         THE COURT:  I would be closer to where you are at

6    if, on day one, Weldon went to him and, in effect, the

7    transaction was to supply him powder that became crack.  In

8    other words, they jointly undertook their activity in '98, at

9    least in '98, right?

10         MR. SPEARS:  Yes.

11         THE COURT:  He and Weldon were jointly conducting

12    activity, objective of which was to sell powder cocaine.

13         MR. SPEARS:  Correct.

14         THE COURT:  And I don't have any -- I don't know

15    anything on the record that shows, even implicitly, that in

16    2000, when Weldon decides to change the object of his own

17    personal criminal activity or the criminal activity he's

18    engaged in with his buyers, that this defendant joined that,

19    or acted in a way that showed that he implicitly agreed to

20    that.

21         If you look at example 7 on page 22 of the

22    guidelines, Attorney Spears, it's not real helpful but

23    because, again, it's quantity, it's not type, which has a

24    peculiar impact, but there, you are talking about the flip,

25    you've got a big distributor and you've got -- he gets one

**EXHIBIT A**

1    person to distribute 500 grams.  Now, that little distributor

2    knows that he's now buying drugs from a guy who's involved in

3    a much bigger conspiracy, quantity wise, that's what the

4    example says, No. 7.

5            But it says:  As long as defendant's agreement and

6    conduct is limited to the distribution of the 500 grams, he's

7    accountable only for that."

8            I guess if I could change that sentence:  "As long

9    as defendant St. Surin's agreement and conduct is limited to

10   the distribution of powder, St. Surin is accountable only for

11   powder."

12           MR. SPEARS:  Right, but I guess we are receiving --

13           THE COURT:  You draw more from the facts in the 2000

14   time period and the phone calls in 2001.  You draw from that.

15           MR. SPEARS:  Correct.

16           THE COURT:  All right.

17           MR. SPEARS:  I mean, I think that example is

18   designed to protect the person further down the supply chain,

19   not the person that's driving.

20           THE COURT:  Right, but relevant conduct under the

21   guidelines, the type of drugs is significant to relevant

22   conduct, right?

23           MR. SPEARS:  Yes.

24           THE COURT:  Just like quantity is significant in the

25   example.  So the fact of the matter is that conversion of it

**EXHIBIT A**

1    to crack cocaine, while there may have been more demand on the

2    street for crack, it's not as if -- well, if I want to sell

3    crack, I have to buy -- let's say Weldon has five customers in

4    1999, he was buying powder and selling powder to the five.

5    Now the five say, no, we want the same equivalent of

6    crack cocaine.  And that means that he, Weldon, has to buy

7    three times as much powder to supply those five people with

8    equivalent crack cocaine.

9    In effect, that supplier then knows and would be

10    part of, okay, I'm now supplying a crack distribution as

11    opposed to the powder, which was only a third.  It's not a

12    very good example.

13    MR. SPEARS:  I understand the example.

14    THE COURT:  But here, we don't have -- that's sort

15    of what I'm searching for in the record, is what, if anything,

16    happened in St. Surin's behavior, remarks, conduct, when

17    Weldon went from powder to crack.

18    MR. SPEARS:  I think what happened was he became

19    more and more integral part of Weldon's supply chain and in

20    fact was the exclusive source of supply.  Weldon's business

21    also seems to thrive at that point, insofar as he landed, you

22    know, the big customer, being the Burden crack operation.

23    THE COURT:  Well, right.

24    MR. SPEARS:  Your Honor, just to go back to the

25    authorities, granted they are unreported decisions of the

**EXHIBIT A**

1  Eighth and the Fourth Circuit, and I would submit that Judge

2  Burns's treatment of Oswaldo Rodriguez is also analogous and

3  supports the attribution.

4       THE COURT:  I don't mean to suggest in any way that

5  you have not represented that case to me accurately.  My

6  concern is that because it didn't go up on the Second Circuit

7  kind of review of it and I don't have an opinion from Judge

8  Burns, I don't have a full appreciation as perhaps you do, but

9  maybe it's not so sharp in your mind because it was a while

10 ago that you could share it with me of all of the facts and

11 sort of nuances of that particular situation because I do

12 think that's important.  So I'm hesitant to sort of say, well,

13 okay, that's how it was in that case.  That's the benefit of

14 like a circuit opinion, is I have sort of the facts that they

15 say were enough or not enough and I can then --

16       MR. SPEARS:  In the Rodriguez case, the issue on

17 appeal was the adequacy of the findings, so I appreciate your

18 Honor's efforts.

19       THE COURT:  Let me take a look.  As I say, I

20 apologize.  As I say, I had not seen the Duffy case.  Let me

21 take a quick look at the facts in that case.

22       I think I need to deal first with the Apprendi issue

23 before I can turn to the relevant conduct issue.

24       Let me just briefly state on the record my analysis

25 of that.  My understanding is that the defendant urges on the

**EXHIBIT A**

1    Court an offense level of 32, which would be based upon the

2    quantities as found by the jury.  In fact, it's not that they

3    found a quantity but they found a category of quantity -- of

4    50 grams or more of base and five kilograms or more of powder.

5    So it's not that they found a quantity; they found a minimum

6    quantity, I should say.

7           In Apprendi, the Supreme Court held that "other than

8    the fact of a prior conviction, any fact that increases the

9    penalty for a crime beyond the prescribed statutory maximum

10   must be submitted to a jury and proved beyond a reasonable

11   doubt."

12          Apprendi, 530 U.S. at 490.

13          Since Apprendi was decided, there has been

14   substantial case law that has held that the Apprendi decision

15   does not require a jury, as contrasted with a sentencing

16   Judge, to find a sentencing fact that affects the defendant's

17   sentencing guideline calculation.  For example, U.S. versus

18   Garcia, 240 F.3d 180, 184, from the Second Circuit in 2001.

19          The Second Circuit has specifically stated that "you

20   therefore join the other nine circuits that have ruled on

21   direct review that a guideline factor unrelated to a sentence

22   above a statutory maximum or to a mandatory minimum may be

23   determined by a sentencing judge and need not be submitted to

24   a jury."

25          In this case, the defendant was convicted of

**EXHIBIT A**

1    conspiracy to possess with intent to distribute and

2    distribution of more than 50 grams of cocaine base and more

3    than 5,000 grams of cocaine, in violation of various sections

4    of Title 21 of the United States Code.

5         Section 841(b)(1(A), one of those sections, states

6    that the applicable sentence for a conviction of this quantity

7    of drugs shall be "not less than ten years or more than life."

8    Thus, under the statute, the maximum sentence the defendant

9    may be sentenced to is life.

10        As such, a finding by the Court that the defendant

11   qualifies for a sentence based on quantity of drugs above the

12   500 grams of cocaine base and 5,000 grams of cocaine that were

13   charged in the indictment and found by the jury does not

14   violate Apprendi.

15        As long as the sentence imposed is within the

16   statutory maximum, in this case life, the sentencing Court can

17   consider other conduct so long as such conduct is proved by a

18   preponderance of the evidence.  United States versus Watson,

19   519 U.S. 148, 154 and 157, 1997.

20        I'm sorry, I gather I misspoke at some point when I

21   was speaking about a finding by the Court that the defendant

22   qualifies for a sentence based on a quantity of drugs, I think

23   I said 500 grams of cocaine base, I meant to say 50 grams or

24   more of cocaine base.  I apologize for that.

25        Obviously, the jury here made a specific finding

**EXHIBIT A**

1    under Apprendi that the maximum statutory levels that are

2    applicable of 50 grams or more of cocaine base or crack, and

3    five kilograms, or 5,000 grams, of powder cocaine or more,

4    that triggers a maximum sentence of life and so long as this

5    Court, based upon its findings of quantity, imposes no

6    sentence greater than life, I believe I run afoul of Apprendi,

7    and I would cite United States versus Garcia for support in

8    that respect.

9         Therefore, the Court understands its obligation,

10   responsibility, is to determine, based on the preponderance of

11   the evidence, the relevant conduct of this defendant with

12   respect to quantity and type of drugs.

13        In that regard, let me state the following:  Patrice

14   St. Surin was convicted by the jury of one count of conspiracy

15   to possess and distribution of more than 50 grams of cocaine

16   base and more than 5,000 grams of cocaine in violation of 21

17   U.S.C. sections 841(a)(1), (b)(1)(A), and Section 846.

18        Based upon, among other thing, the trial testimony

19   of Eugene Weldon, the other things including numerous

20   telephone wiretap conversations, as well as other evidence,

21   St. Surin directly supplied Weldon with ten to eleven -- at

22   least ten to eleven -- kilograms of powder cocaine in the

23   period from 1998 to 2001.

24        The Court has gone through not only the presentence

25   report but also the trial transcript, and support for that

**EXHIBIT A**

1  conclusion of the powder quantity can be found as follows:

2  The transcript on day 2 in the pages 43 through, say, 53,

3  there are three transactions in '99 that are specifically

4  testified to, first two with Thomas Holman in which Weldon

5  buys from St. Surin on each of two occasions one kilogram and

6  then in which he sells to Mr. St. Surin one kilogram.  That

7  would be three kilograms.

8         In addition, in 1998 -- at pages 35 through 37, in

9  that range -- Mr. Weldon testified of a two- to three-month

10  period in which transactions were occurring regularly of

11  quarter of a kilogram quantity.  If I conservatively estimated

12  nine weeks, sale, say, roughly every other week at a quarter

13  kilogram, I'm up to one and a quarter kilograms in total.

14         Lastly, in the time period described as fall of 2000

15  through April of '01, Mr. Weldon testified to near weekly

16  sales, purchases, excuse me, from Mr. St. Surin of powder.  I

17  read the trial transcript to say at the level of a half a

18  kilogram.  His sales, Mr. Weldon's ultimate sales, were in the

19  quantity ranges of three to five hundred kilograms of crack or

20  powder but I believe he was purchasing, record establishes,

21  from Mr. St. Surin the rate of half a kilogram, as I say

22  conservatively, perhaps once every week-and-a-half.

23         If we take the fall to be, say, from November until

24  April, counting not all of April but only up to April, let's

25  say there's approximately 20 to 24 weeks, it's about once

**EXHIBIT A**

1   every week-and-a-half at a half a kilogram, that gets you to

2   somewhere in the range of seven kilograms of powder cocaine.

3          So I've just accounted for, on those rough

4   approximations which I think are conservative, over 11

5   kilograms of powder, and that's the basis for my statement

6   that from '98 to 2001, Mr. St. Surin supplied Weldon with 10

7   to 11 kilograms of cocaine.

8          Also, the record establishes that Mr. St. Surin

9   bought from Weldon, I think I'm going to find, 124 grams of

10  cocaine base, although, as I say, the record is a little bit

11  unclear, it could be more than that, but the larger amount of

12  187, in the Court's understanding, would not alter the

13  guideline calculations, so I'll find 124 grams.

14         These quantities were directly testified to by

15  Weldon and the Court finds Weldon's testimony to be credible,

16  especially given that much of his quantity was bolstered by

17  wiretap and video surveillance evidence confirming his

18  statements.

19         Based upon the combination of this quantity alone,

20  the defendant would have a base offense level of 34 with a

21  sentencing range, given his absence of criminal history, of

22  151 to 188 months.

23         During the trial, as well as during sentencing of

24  Thomas Holman, testimony has been elicited before this Court

25  from Weldon as to the defendant's other drug deals between

**EXHIBIT A**

1    himself and Holman.  I'm sorry, the Court's not going to

2    consider that in the course of this sentencing.

3           The presentence report, however, goes beyond the ten

4    kilograms of cocaine and attributes to this defendant 1.5

5    kilograms of cocaine base, which of course results in a base

6    offense level of 38.

7           This quantity was calculated by attributing to the

8    defendant all of the known quantities of crack cocaine that

9    Weldon sold to various buyers using the cocaine powder that

10   Mr. St. Surin provided to Weldon.

11          As is clear from our colloquy to date, the defendant

12   has filed objection to the quantity calculations, arguing that

13   the references to Weldon's cocaine base trafficking cannot be

14   used to calculate the quantities of cocaine base upon which

15   this defendant should be sentenced.

16          Defendant objects to a finding that the Weldon

17   cocaine base sales to anyone other than himself were

18   reasonably foreseeable but actually, the defendant has not

19   objected to that but objects to a finding that they were part

20   of their jointly undertaken activity.

21          The Court will first quote from the commentary to

22   Section 1B1.B, its first application note:  "Principles and

23   limits of sentencing accountability under this guideline are

24   not always the same as the principles and limits of criminal

25   liability."

**EXHIBIT A**

1          Sentencing guidelines provide that "in the case of a

2     jointly undertaken criminal activity, all reasonably

3     foreseeable acts and omissions of others in furtherance of the

4     jointly undertaken criminal activity" shall be relevant

5     conduct for that defendant.   Section 1B1.3(a)(1)(B).

6          Second Circuit has found when looking to determine

7     the relevant conduct of the defendant, the District Court

8     "must make two findings:  One, that the acts were within the

9     scope of the defendant's agreement; and two, they were

10    foreseeable to the defendant."  United States versus Studley,

11    47 F.3d, 569, Second Circuit 1995.

12         It is the government's burden to prove the facts

13    relevant to sentencing, including drug quantity and type, by a

14    preponderance of the evidence.  United States versus Desimone,

15    119 F.3d 217, at 228, Second Circuit 1997.

16         In Studley, the Second Circuit specifically

17    addressed what evidence the District Court should use to

18    determine whether conduct was jointly undertaken.

19         Before I turn to that issue, though, the Court wants

20    to make clear, I do not understand the defendant to object to

21    the Court finding that Mr. Weldon's conversion beginning in

22    2000 of the powder cocaine to crack was "reasonably

23    foreseeable," as that is one of the two elements Studley

24    identifies pertinent to the relevant conduct of jointly

25    undertaken relevant activity.

**EXHIBIT A**

1          Even if the defendant were to object to that, and

2    I've misunderstood the defendant's position, the Court finds

3    that it's well-beyond a preponderance of the evidence been

4    established that Mr. St. Surin, it was reasonably foreseeable

5    to him that Weldon would convert, certainly beginning in 2000,

6    powder into crack and as the government says correctly, it was

7    more than foreseeable, it was known to him, the evidence has

8    established beyond a preponderance and the Court so finds that

9    Mr. St. Surin was present and in Eugene Weldon's presence when

10   he was converting powder cocaine to crack; that he was aware

11   of sales by Weldon of crack cocaine derived from his powder

12   that he supplied by Weldon to others; that he, himself, bought

13   crack from Weldon at a time when he was the sole powder

14   supplier to Weldon.  I believe that's correct time-wise.

15          So for all of those reasons, the Court finds that

16   there's overwhelming evidence that it was "reasonably

17   foreseeable" that as one of the two factors required under

18   relevant conduct 1B1.3(a)(1)(B) finding, let me turn to the

19   second one, the more troublesome one, that is that it was in

20   furtherance of jointly undertaken criminal activity and in

21   particular, as that has been defined under Studley to be that

22   the acts were within the scope, in other words, the acts the

23   government wishes to make the defendant responsible for under

24   relevant conduct, that those acts, in this case Weldon's sale

25   of crack cocaine from powder obtained from St. Surin, that

**EXHIBIT A**

1  those acts were within the scope of the defendant's agreement.

2       In Studley, the Second Circuit specifically

3  addressed what evidence the district courts should use to

4  determine whether conduct was jointly undertaken.  The Court

5  found that Note 2 for Section 1B1.3(a)(1)(B) was instructive

6  when it explained that "the scope of the criminal activity

7  jointly undertaken by the defendant is not necessarily the

8  same scope of the entire conspiracy and hence relevant conduct

9  is not necessarily the same for every participant."  Studley,

10 47 F.3d at 574.

11      The Studley court also instructed that "district

12 courts are required to make a particularized finding of the

13 scope of the criminal activity agreed upon by the defendant."

14 That's same page, 574.  "The District Court may consider both

15 explicit and implicit agreements that can be fairly inferred

16 from the conduct of the defendant."  Id at 575.

17      Some of the language in Studley that the Court

18 focused on appears at 576, under the application of guidelines

19 facts of this case.  There, contrasting Studley to some of the

20 examples in the guideline notes, the Court noted that the

21 defendant to be sentenced did not design or develop the

22 telemarketing scheme and that there was "no evidence that he

23 worked in any way to further the scheme outside of his own

24 sales effort."  Obviously, the Studley facts, not a drug case,

25 but involve a telemarketing scheme.

**EXHIBIT A**

1        Further in that same paragraph, the Studley court

2   focused on the fact that the defendant being sentenced

3   received no profits of the overall operation and further, no

4   evidence that he assisted other representatives with their

5   sales.

6        Of course, in that case, there was evidence that he

7   was competing against the other representatives for

8   commission, which there's no facts like that here.

9        While the Court finds that it's not particularly

10  aided by the examples or illustrations of conduct which the

11  guideline commission has gone to great length to provide under

12  this particular section of the guidelines, none of them focus

13  upon the issue of the type of drugs.

14       They do, however, in discussing particular examples,

15  continually use the phrase "the specific objective of the

16  criminal activity he," meaning the defendant, "joined."  I

17  have in mind at page 20 of the guidelines, at the first

18  example No. 1, (a)(1), (a)(1)(B) there's that language, "the

19  specific objective of the criminal activity he joined."

20       Further, I've already spoken about, I'm not going to

21  repeat my observations about example 7 and how that might

22  inform the Court's decision in this respect and, in fact, I'll

23  incorporate my remarks and exchange with government's counsel

24  on that at this point in my decision.

25       In this case, the conversion of cocaine by Weldon

**EXHIBIT A**

1  was clearly foreseeable to St. Surin, as I've already said.

2  He witnessed Weldon cook cocaine on one occasion, he knew

3  Weldon buyers in 2000 certainly were purchasing base, the wire

4  transcripts make this clear.  Certainly he was aware of it

5  through the arrest of Adam Sanders which St. Surin of course

6  was concerned about, and in other phone calls St. Surin

7  expresses concern over the arrest of members of the Burden

8  organizations, whom he knew were buying crack from Weldon.

9       The primary issue, though, is whether Weldon's

10  conversion of powder was jointly undertaken activity of Weldon

11  and St. Surin.  The Second Circuit has found that mere

12  knowledge of another conspirator's criminal acts is not enough

13  to hold the defendant responsible under relevant conduct

14  principles for those acts.  Studley, 47 F.3d at 575.

15       As I said, relevant factors to consider in

16  determining whether activity is jointly undertaken are:  One,

17  whether the participants pooled their profits and resources or

18  worked independently; and two whether the defendant assisted

19  in designing and executing the illegal scheme, Studley at 545.

20       The Kell case, as I pointed out, also from the

21  Second Circuit, there suggests a fact that was present in Kell

22  of not only knowledge, as we have here, but also that

23  suggestion of assistance to the buyer of the powder in his

24  process of converting it to crack and offer of assistance by

25  the supplier.

**EXHIBIT A**

1              The Duffy case out of the Fourth Circuit -- trying

2    to find it -- has some language, I should point out that as

3    the government did, it's not a for publication opinion and it

4    is from the Fourth Circuit, but given the paucity of precedent

5    here, the Court will look to anything.

6              There is some language in that opinion referring to

7    the knowledge of the defendant that the powder was going to

8    crack,  "This evidence is more than sufficient to support the

9    District Court's conclusion that Jones was responsible for at

10   least 1.35 kilograms of cocaine."  That would be 2002 WestLaw,

11   376320 at Star 7, which I don't think that's a proper

12   statement of the law as interpreted under Studley in the

13   Second Circuit.

14             However, in this case, this meaning the Duffy case,

15   the Fourth Circuit had additional evidence on the record

16   before it, in particular there was evidence that the sentenced

17   defendant, Jones, it was Jones in the Duffy case, Jones who's

18   the subject of this discussion of "is he subject to the crack

19   guidelines or powder," that quote Jones once gave advice to

20   another defendant about cooking the powder in an oil base,

21   that's at Star 6.

22             Given it's an unpublished opinion and the language

23   which might suggest the government's position but which is

24   troublesome to me, unless this evidence also includes the

25   advice about how to cook powder cocaine, and that's how the

**EXHIBIT A**

1   Court's going to read that opinion.

2          As I believe I reviewed with the government, all of

3   St. Surin's sales to Weldon were powder, all of the defendants

4   in 292 were also powder sales by St. Surin, that there's no

5   evidence of sales of crack cocaine by St. Surin, there is no

6   evidence of involvement by St. Surin in Weldon's operation in

7   the nature of a sharing of profits, assistance in the

8   preparation or the conversion of the product, or in the sale

9   of the product in identifying intermediate distributors,

10  identifying ultimate buyers.  There's no evidence of St.

11  Surin's involvement in that.

12         Further, there is evidence, the record establishes,

13  that Mr. St. Surin began to supply Weldon in 1998 and at that

14  time, supplied powder, as he did throughout the relationship.

15  However, in 1998, the evidence is uncontested that Weldon was

16  selling only powder.  So that when St. Surin began his jointly

17  undertaken activity with Weldon in the form of supplying him,

18  Weldon was selling only powder.

19         Clearly, at some point, Weldon chooses to begin to

20  supply crack, probably take advantage of this large customer

21  known as the Burden organization, which wanted crack.

22         However, the record, I believe, is devoid of any

23  evidence or -- I shouldn't say it's devoid because I don't

24  mean to diminish the government's argument to that extent.

25  Obviously, the government has pointed to some conversations

**EXHIBIT A**

1    and remarks by defendant, and I am not rejecting those as

2    having happened.  In other words, I'm not finding that that

3    didn't occur.

4         What I'm meaning to say is that those comments, to

5    me, clearly evidence the knowledge or foreseeability aspect of

6    the burden here, but I don't believe evidence jointly

7    undertaken activity in the form of St. Surin joining with or

8    acting in furtherance of Weldon's distribution of crack.

9         Again, the government points to the fact that the

10   defendant was fronting drugs for Weldon, that he had a stake

11   in the sales.  That was true when Weldon was buying and

12   selling only powder and again, I see nothing in the record

13   that persuades me, by a preponderance, that when Weldon

14   chooses to change his sales to crack, that this defendant did

15   anything in furtherance of undertaking jointly with Weldon

16   that distribution of crack.

17        St. Surin had no control over his conversion

18   activities.  Didn't aid or abet or assist or instruct him in

19   doing it.  The cooking of the cocaine was separate and apart

20   from the supplying of it.  There's no evidence that the Court

21   recalls that St. Surin encouraged Weldon to cook or convert

22   the powder, or that St. Surin supplied any essential tools or

23   even gave him advice on what he needed.

24        There's no evidence that St. Surin found crack

25   buyers for Weldon or that St. Surin really had any influence

**EXHIBIT A**

1    in Weldon's operation, meaning the operation of the sales of

2    crack cocaine.

3            Certainly, they had a long-term relationship but, as

4    the court says, there's no evidence presented at trial to

5    suggest the relationship changed once Weldon began to convert

6    the powder into base.

7            Further, as I say, St. Surin had no control over the

8    scope or duration of Weldon's operation.  If Weldon stopped

9    placing orders, St. Surin really had no recourse or no control

10   or involvement with the operation.

11           Under the guidelines, the Court's required to

12   determine the relevant conduct attributable to this defendant.

13           This case presents an unusual situation because, as

14   the government points out, normally the supplier is

15   responsible for all that's distributed because the

16   distribution network breaks down into smaller pieces below

17   that supplier.

18           However, the defendant here doesn't really question

19   that all of the quantity he supplied, he's responsible for,

20   which is really how the fact usually arises, as the

21   government, you know, makes that argument to me.

22           The defendant's argument's limited solely to the

23   question, the crux of it is, that he's not responsible for the

24   form in which Weldon chose to distribute the drugs.

25           The difficulty is that under the guidelines, the

**EXHIBIT A**

1  specific objective of Mr. St. Surin was the distribution of

2  illegal substances.  But I believe that the guideline requires

3  the Court to make a finding of whether Mr. Weldon's conduct

4  was in furtherance of jointly undertaken activity with Mr. St.

5  Surin.

6          And I'm going to state one other fact or premise for

7  the Court's ruling.  There is no question that Congress and

8  the Sentencing Commission have drawn a great significance

9  between the type of drug that we are discussing here, that is

10  whether it be in its powder or in its crack cocaine form, or

11  base form.

12          So if I marry that principle, or that underlying

13  premise of the guidelines that there is a distinction in the

14  type of cocaine for sentencing purposes, I think I must

15  conclude that, therefore, that difference has to be focused on

16  in determining relevant conduct, and while there is no

17  question that Mr. St. Surin, the relevant conduct of Mr. St.

18  Surin involved the distribution of all of the quantity he

19  supplied to Weldon, which in turn Weldon sells, that the Court

20  does not find, by a preponderance of the evidence, that the

21  acts of Weldon converting the powder three years into the

22  relationship with St. Surin were within the scope of St.

23  Surin's agreement with Weldon, the agreement being St. Surin

24  supplying of the drugs in powder form and Weldon's buying them

25  in the powder form; and the fact that this defendant was well

**EXHIBIT A**

1    aware of what Weldon eventually decided to do with the powder

2    cocaine for distributing it, i.e., three years into their

3    supply relationship, does not support a conclusion by a

4    preponderance of the evidence on this record to this Judge

5    that Weldon's behavior starting in late 2000 was in

6    furtherance of conduct he jointly undertook with Mr. St.

7    Surin.

8            So for all of those reasons, the Court is not going

9    to adopt the presentence report's recommendation that I find

10   1.4 kilograms of base, which would drive a level 38; but

11   instead will find ten grams or more of powder cocaine and 124

12   grams of cocaine base, which, I'm not going to recite the

13   government's calculation which the defendant concedes at page

14   12 of the government's memorandum is accurate using a

15   marijuana conversion table, well, ten kilograms converts to

16   2000 kilograms of marijuana, 124 grams of crack converts to

17   2480 kilograms of marijuana, triggers a base offense level of

18   34 under the guidelines.  I believe everybody's in agreement

19   with that.

20           Hearing no objection, the Court will find that the

21   base offense level for Mr. St. Surin, based upon my findings,

22   is 34.  There being no other adjustments, the adjusted offense

23   level is 34.  There being no acceptance of responsibility, the

24   total offense level is 34.  There being no criminal history,

25   the defendant is criminal history category I.

**EXHIBIT A**

1          Base offense level of 34, category I, is 151 to 188

2    months.  Other than obviously preserving the government's

3    position on my ruling with respect to the crack cocaine

4    quantity under relevant conduct Chapter 1, does the government

5    have any exception to the Court's finding?

6          MR. SPEARS:  No, your Honor.

7          THE COURT:  Does the defendant, obviously preserving

8    your Apprendi argument, have any objection to my findings?

9          MR. SWAINE:  No, your Honor.

10         THE COURT:  Thank you.  If we could just pause for

11   one moment, I see Attorney Aspinwall's in the court, obviously

12   Attorney Spears is already here because he's already occupied

13   on another matter related to the 263 case.

14         Attorney Aspinwall, I suggest we'll be another 20

15   minutes, I don't know if you want to meet with your client

16   downstairs.

17         MR. ASPINWALL:  I have met with him already.

18         THE COURT:  All right.  I'm sorry to keep you

19   waiting but I have to finish this up.

20         I guess I would at this time like to hear from

21   defense on the issue of sentencing.  I don't believe there's

22   been any suggestion that departures either down or upward, so

23   I would ask for sentencing within the guideline range.

24         Attorney Swaine, obviously, I'm sure you've talked

25   to Mr. St. Surin about whether he wishes to address the Court

**EXHIBIT A**

1  himself on the issue of that sentencing determination within

2  the guideline range.

3          And Mr. St. Surin, I want to make sure I've advised

4  you that, again, I think I did already, that you have the

5  right to address me today on sentencing within that range or

6  in the sentencing decision, and if you want to speak, address

7  the Court -- obviously, Attorney Swaine's going to speak on

8  your behalf but if you want to speak to the Court directly --

9  you have a right to do so and I would be pleased to hear from

10 you.

11         If you don't wish to, for whatever reason that's

12 good to you, that's fine, and it's not a problem if you don't

13 address the Court.  Obviously I'll rely on the arguments that

14 I get from the government, as well as your own counsel, all

15 right, sir?

16         But I would leave it to you, Attorney Swaine, if

17 your client does wish to address the Court to advise me of

18 when it would be a good time for him to do that.  In other

19 words, I'm not going to specifically call on him, it's up to

20 you, all right?

21         Attorney Swaine?

22         MR. SWAINE:  Thank you, your Honor.  Would you mind

23 if I remain here?

24         THE COURT:  That's fine, wherever you are

25 comfortable is fine with me.

**EXHIBIT A**

1          MR. SWAINE:  Thank you.  As your Honor knows, Mr.

2    St. Surin has maintained his innocence and certainly I want to

3    say for the record, I know the Court's aware of it, I would

4    like my client to also hear it, that anything I said in

5    argument today with regard to the relevant conduct wasn't

6    meant to be an admission of wrongdoing on his part at all.

7          THE COURT:  Absolutely.  Obviously, you are, I guess

8    I'll say, making the best of what you can.  You were, as I

9    understood it, in effect, accepting, for purposes of argument,

10   only that certain facts may have been established, or at least

11   in the Court's view, established at trial and from those

12   facts, making certain arguments, and that's what I understood

13   you to be doing, sir.

14         MR. SWAINE:  That's correct.  Thank you, your Honor,

15   I appreciate that.

16         With regard to a sentence within the guideline range

17   of 34, obviously as the Court pointed out, he has no prior

18   history so it's from 151 to 188 months.  There isn't a great

19   deal in the presentence report about Mr. St. Surin's

20   background, as he chose, when initially represented post

21   verdict by Attorney Dolan, to not discuss, in large part

22   because of his maintenance of innocence, with the probation

23   officer who did the presentence report.

24         But I think there's enough in there that the Court

25   now can take notice of to make a decision, and certainly will

**EXHIBIT A**

1    make a decision, within this guideline range.

2             He will be 44 this year, an age that we don't always

3    see in this arena.  Many of the mostly young males who come

4    before this Court and state courts in the drug world are just

5    that, youthful, and not to exclusion, but certainly any

6    sentence within this guideline range will, in effect, make Mr.

7    St. Surin well into his 50s before he sees the light of day.

8             I think the concept of him being repetitive at that

9    age also statistically goes down radically as people move on

10   in their age.

11            I think the other thing that's important for the

12   Court to be aware of, and I know is aware of, is Mr. St.

13   Surin's immigration status.  He is not a United States citizen

14   and certainly, under the Immigration Nationality Act, a

15   conviction such as he now faces would be considered and

16   defined under Section 101 of that Act as an aggravated felony.

17            As a person convicted of an aggravated felony under

18   the Immigration Nationality Act, he's removable from the

19   United States with absolutely no claims of relief from

20   deportation.  There are no judicial recommendations against

21   deportation allowed anymore, there's no 212(a) relief or a

22   waiver of it because of the date of this conviction post

23   dating the antiterrorism and effective death penalty act.

24            THE COURT:  I'm well aware of that from my reversal

25   of the Second Circuit of me.

**EXHIBIT A**

1          MR. SWAINE:  I say that only in the sense that the

2    moment Mr. St. Surin is done with his business with the Bureau

3    of Prisons after sentence by this Court, the Department of

4    Homeland Security will have placed a detainer on him, will

5    probably have already moved him through the court proceeding,

6    and while his ultimate residence and location in this world

7    won't ultimately drive your Honor in making a decision where

8    to place him in the guidelines, he will be not living in the

9    United States of America, nor ever legally entitled to return,

10   because one convicted of an aggravated felony is permanently

11   barred from reentry into the United States.  Any illegal

12   reentry in such a circumstance would obviously be a

13   significant federal violation of significant incarceration.

14          THE COURT:  Can I particularly inquire, obviously

15   Mr. St. Surin has chosen not to be interviewed by the

16   probation officer so Mr. Lopez had to do what he could to

17   determine information, and apparently the defendant, when he

18   was in his arraignment sort of phase, filled out some

19   information and listed a job or two where he worked and his

20   work past took up those and information from Mr. St. Surin's

21   wife and then made inquiries and got some information, and it

22   appears to me even if I assume that Mr. St. Surin's

23   information in arraignment stage, presentment stage, was

24   limited to the past few years, that even if I look at the last

25   three-and-a-half years before he was arrested, it would appear

**EXHIBIT A**

1   that he worked part-time for a year for one company and

2   although his wife said he worked for a company on and off for

3   four years, that company confirms employment only during a

4   one-year period of time in 2000.

5          So I have a defendant who's worked part- to full-

6   time for maybe two years total and unaccounted for employment

7   for the remaining, say, half of the time, just that narrow

8   time period I'm looking at.

9          MR. SWAINE:  Two things, your Honor.  My client

10  advises me that he worked for Stamford Taxi for over ten years

11  and in light of -- as a digression but nonetheless to keep

12  abreast with my client's wishes, he desires me to state that

13  in my presentation to you at the moment, I'm speaking in

14  general and not with his agreement --

15         THE COURT:  Okay.

16         MR. SWAINE:  -- however, I believe remain his

17  advocate and believe what I'm saying benefits him.  Obviously,

18  the Court will tell me if it doesn't.  But in light of earlier

19  discussions today, I feel obligated to state that for the

20  record.

21         Other than that, that's all that I'm aware of, and

22  there is a very abbreviated past history of this gentleman

23  before the Court.

24         151 months, lower end of the guideline range, is, I

25  believe, just over 12 years.  When given the full amount of

**EXHIBIT A**

1    time one does in the Bureau of Prisons, Mr. St. Surin would be

2    close to 55 at the time of his release.  I think it more than

3    adequately penalizes him for the jury's finding of conviction

4    and their verdict and the safeguards the Court's interest in

5    what a penalty is supposed to do and what a sentencing is

6    supposed to accomplish.

7        Beyond that, I really don't have a lot to say on his

8    behalf.  Just reassure the Court, I have stated it several

9    times now so I'm getting a little repetitive, of his stance of

10   his own innocence.  In light of that, he may continue to

11   remain silent today.

12       THE COURT:  I understand that, and I appreciate that

13   that places the defendant somewhat in a difficult position,

14   let alone his counsel, but clearly the defendant.  But the

15   fact of the matter is, I have a jury verdict and I've heard

16   testimony which I, myself, find credible which supports Mr.

17   St. Surin's guilt, and I therefore have an obligation to

18   impose a sentence today.

19       And while he is absolutely entitled to not speak to

20   the probation officer, to be silent here today, to not do

21   anything other than to contest that the evidence establishes

22   what either the government says it is or I do, I nonetheless

23   must proceed to sentence him based on the record in front of

24   me.  I know you appreciate that.

25       MR. SWAINE:  I've informed him of that and I know

**EXHIBIT A**

1  Attorney Dolan filed a motion for acquittal and denied, a copy

2  of your decision was given to Mr. St. Surin, I assumed by Mr.

3  Dolan but apparently not, I provided him with that a while ago

4  so he's aware of issues of credibility and guilt.

5        THE COURT:  Again, I don't want to encourage it.

6  The defendant, I assume, wishes to remain silent today?  He

7  doesn't want to address the Court?  I want to be certain he

8  knows that today, he has that right.

9        MR. SWAINE:  He does know he has that right, your

10  Honor, and I, just before your Honor began to allow me to

11  address the Court, I asked him if he wanted to maintain his

12  right to silence.  I believe he does.

13        THE COURT:  Okay.  All right, that's fine then.  I

14  don't know if you have anything further to add, sir.

15        MR. SWAINE:  I don't, your Honor.

16        THE COURT:  Thank you, Attorney Swaine.

17        Attorney Spears?

18        MR. SPEARS:  Your Honor, I know you've read the

19  presentence report and all the supporting materials.  I really

20  have nothing further to add.  It's evident from the

21  presentence report that the defendant has had what I would

22  regard as lackluster employment record.  He has not been

23  cooperative with probation.

24        My understanding is that he does maintain his

25  innocence but nevertheless, the government would submit there

**EXHIBIT A**

1    were opportunities for him to be cooperative, at least in the

2    nature of his family relationships and other categories.

3           As I see it, there are two additional points that I

4    just want to address.  I know that your Honor, at the outset,

5    raised the question of the fine.

6           THE COURT:  Yes, I'm sorry, that's what I was

7    looking for.  I had some notes about the issue of fine and I

8    guess I probably should have asked Attorney Swaine, but my

9    understanding is that I must impose a fine except where the

10   defendant establishes he's unable to pay and not likely to

11   become able to pay a fine.

12          MR. SPEARS:  That's my understanding, subsection (e)

13   of 5E1.2, and I would argue that.

14          The only other additional point I was going to make,

15   in regards to deportation, the government would ask that, as a

16   condition of supervised release, that he not reenter the

17   United States.

18          Unless your Honor has any questions.

19          THE COURT:  The only question I would have is in

20   deciding where to sentence, within the range.  I would ask the

21   government's view on whether it would be error for the Court

22   to consider the defendant's, in my view, well-established

23   knowledge of the fact that this drug was becoming crack and in

24   turn, sold on the streets of Norwalk to an organization, and

25   whether this defendant knew of the violence involved in that

**EXHIBIT A**

1   organization, just generally, that the sale of crack is a

2   dangerous and violent activity that part of the Court's

3   consideration of where to sentence him in the guideline range

4   can be informed by that, even though that was insufficient to

5   justify attributing him for relevant conduct, all the quantity

6   attributed to him.

7           MR. SPEARS:  I would agree with that whole-

8   heartedly, your Honor, I think it's authorized by statute and

9   in fact is one of the factors your Honor's asked to consider

10  in sentencing a defendant is the nature of the criminal

11  conduct he engaged in and the government, as you gather from

12  comments earlier, does attribute significance to the

13  defendant's full knowledge that the drugs he was supplying

14  were at least in part further distributed in the form of crack

15  cocaine.  I think that's absolutely fair game.

16          I didn't want to interfere with your Honor's

17  discretion with regard to the range, but I agree with that.

18          THE COURT:  I'm not asking you to interfere with my

19  discretion; I'm just asking, if I were making an error in that

20  respect, I would look to the government to call that out to

21  me, I guess, even though it might be in their interest to have

22  me support a different sentence based on it, if it were wrong

23  as a matter of law.

24          But as I read 1B1.4, under the guidelines, I can

25  use, without limitation, any information concerning

**EXHIBIT A**

1    background, character and conduct of the defendant and the

2    conduct of this defendant, what I was particularly focusing on

3    then, is his knowledge, or selling of a drug with knowledge,

4    of its ultimate conversion to crack, while not enough to

5    justify an increase in level based on crack quantity, as I

6    rejected that argument of the government, I think is

7    information about his conduct that I can consider.

8           That was the question I had of the government,

9    whether the government thinks that's illegal analysis or

10   improper consideration.

11          MR. SPEARS:  Not at all, your Honor.

12          THE COURT:  I guess, Attorney Swaine, I should turn

13   back to you on the issue of fine and the issue of the question

14   I just put to the government, as to whether you think it's

15   error for me to consider all information I have about the

16   conduct of the defendant in deciding where to sentence him

17   within the range.

18          MR. SWAINE:  I think under the Sentencing

19   Commission's grant of sort of authority, if I might, to the

20   Court, I think in determining within the range itself, the

21   Court does have broad discretion.

22          With regard to the fine, your Honor, I understand

23   that there was no sworn financial affidavit --

24          THE COURT:  Right.

25          MR. SWAINE:  -- prepared.  However, I don't think --

**EXHIBIT A**

1    I didn't come to bear to particularly address that issue

2    today, I don't think the Court can rephrase that.  I think the

3    Court has the ability to make a finding of financial ability

4    based upon the information currently before the Court, which

5    is Mr. St. Surin's long period of a lack of legal employment,

6    his lack of work history, his long now period of incarceration

7    where he has no funds available to him, and sort of the

8    ultimate likelihood of his situation, which is if this Court

9    chooses to impose a fine and will the government of the United

10   States go out of this country to enforce it?

11        And so I think with regard to a factual basis for

12   his financial status, I think there is enough information in

13   the record, in the presentence report itself, that the Court

14   can -- further he doesn't have the financial ability to make

15   payments at this point.

16        THE COURT:  But as I read the guideline, Attorney

17   Swaine, it says the Court shall impose a fine in all cases

18   except where the defendant establishes he's unable to pay and

19   unlikely to become able to pay, and my concern is that I have

20   a defendant as to which I have no evidence that he lived a

21   lavish lifestyle, as with some of the other defendants, I

22   don't think he was driving around in a Mercedes or BMW.

23        MR. SPEARS:  He did own and operate a luxury

24   motorcycle, the value of which was in excess of $10,000.

25        THE COURT:  I wouldn't call that a luxurious

**EXHIBIT A**

1    lifestyle.  It might be the top end of the motorcycle world

2    but it won't buy you much more than a small Nissan Sentra in

3    the automobile world.

4        I guess let me finish my point, in case you think

5    that my reasoning is wrong, but I have him moving

6    conservatively eleven kilograms, but in looking at the

7    February telephone conversations, the three days, he moved

8    over one kilogram.  And my eleven kilogram calculation is

9    based upon a half a kilogram every other week.

10        I mean, we have someone who moved a lot of quantity.

11    I have evidence from Weldon he made a thousand for flipping a

12    kilogram in the same town.  He didn't have to move it

13    anywhere, just in one door and out the other, he made a

14    thousand dollars.  I assume that's all Mr. St. Surin was

15    making, which is probably not a reasonable assumption because

16    I believe that he for the most part got his drugs in New York

17    and there was a margin of profit built in for the risk of

18    bringing it from New York.

19        And maybe the risk of going to New York to get it,

20    let's assume it's the thousand, you know, eleven kilograms is

21    $11,000 -- I'm sorry, I've been on the bench too long this

22    morning because my math is just frozen.  I guess my real point

23    is that I have no evidence of where his profits from this drug

24    activity went.

25        In other words, he's not a drug user.  A lot of

**EXHIBIT A**

```
 1  defendants that I have who have dealt lots of drugs and made

 2  lots of money, in effect, snorted it away, they used it, they

 3  shot it up, whatever.  And so the fact they have come in and

 4  given me a sworn affidavit that says I have no assets, of

 5  course I accept that.

 6           But I have a defendant who's unwilling to tell me he

 7  has no assets under oath.

 8           MR. SWAINE:  With all due respect, your Honor,

 9  again, it's been a long time since this case started and the

10  Court originally began to deal with my client, but I'm

11  assuming that I'm not the first CJA counsel and I would assume

12  that there was a finding of indigency at least under the

13  Criminal Justice Act that was made based upon some submission

14  to the Court.

15           MR. SPEARS:  I have some recollection countering

16  that, that at some point, while it's true, originally Norm

17  Pattis appeared as a CJA attorney, my understanding is he then

18  paid a retainer for Russell, who came in.

19           THE COURT:  Was that Mr. St. Surin?

20           MR. SPEARS:  Yes, your Honor.

21           MR. SWAINE:  It was.  Then Mr. Russell I believe

22  withdrew due to, I think, potential conflicts of interest, CJA

23  counsel was appointed first, I believe, Mr. -- I had a list of

24  them.  I'm sixth.

25           THE COURT:  Michael Dolan was in there.
```

**EXHIBIT A**

1          MR. SWAINE:  Michael Dolan, Rojas and Jason

2     Gladstone was briefly --

3          THE COURT:  He was not ever appointed, it may show

4     that on the record.

5          MR. SWAINE:  Then Michael Dolan did the trial, and

6     Mr. Dolan was CJA counsel in the case.

7          THE COURT:  Yes.  I don't remember a Rojas.

8          MR. SPEARS:  I don't think Rojas ever filed an

9     appearance.

10         THE COURT:  Gladstone and Dolan, in the clerk's

11    office, sort of both of them got chosen at once.  Mr.

12    Gladstone had been very dutiful and put in an appearance in,

13    while I was out of the district, they were unable to bring it

14    to my attention, he put an appearance in and I resolved it by

15    saying Mr. Dolan was going to be the one, I thought that's who

16    had been appointed, so I left it that way.

17         I appreciate your reminding me about -- we should

18    look to see if there was an affidavit.  Because even if he

19    engaged someone on retainer, if he swore to the Court he had

20    no assets, it could be a family member or someone, a friend,

21    who put up the money for the retainer and clearly, while he's

22    been in jail, I really don't know of any source of further

23    income or assets he could have acquired.

24         If there is an affidavit sworn under oath by Mr. St.

25    Surin at the beginning of the case that he had no assets, then

**EXHIBIT A**

1  I will take that.  But if there's not, if for some reason he

2  didn't want to sign one but the magistrate, given the nature

3  of the proceedings, will just appoint counsel under CJA, then

4  I think that the statute says that I must impose a fine unless

5  the defendant creates a record that shows that he cannot pay

6  and hasn't the future ability to pay.

7       So I'm afraid we'll have to hold that issue off

8  while my law clerk finds the court file which wasn't brought

9  in because it's so large.  I said I didn't need it, but I

10  guess we do.

11       MR. SPEARS:  I have some concern, this is obviously

12  not a big point, the fine and all of this, but the fact that

13  the defendant has refused in essence to provide that

14  information to probation is troubling.  If an affidavit

15  couldn't be filled out today, for that matter, is also

16  troubling.

17       THE COURT:  That's why I was inclined to impose a

18  fine when I came out here.

19       He did sign an affidavit and he does report that

20  he's unemployed, he checked no employment, and zero dollars a

21  month earned.  Divorced from his spouse so he doesn't report

22  income on her.  No other income, he puts zero on any other

23  income.  On cash, he puts zero and checks no cash.  On

24  property, he lists a thousand dollars for a Mitsubishi

25  Diamanté, '92; 8500 for the motorcycle, Suzuki, but puts a

**EXHIBIT A**

1    star and says that's pending forfeiture.  Is that your

2    forfeiture?

3         MR. SPEARS:  There may have been a civil forfeiture

4    which ended up being discontinued.

5         THE COURT:  So who ended up with the motorcycle?

6         MR. SPEARS:  It was returned, your Honor.

7         THE COURT:  Returned to the defendant?

8         MR. SPEARS:  Yes, returned to his family.

9         THE COURT:  Okay.  Do you know, Attorney Swaine,

10   what happened to the motorcycle, or its value?

11        MR. SWAINE:  I do, but I need to ask consent.

12        THE COURT:  Go ahead, sir.  Yes.

13        (Mr. Swaine conferring with the defendant.)

14        MR. SWAINE:  I don't have any information that I can

15   discuss with the Court as to ultimately what happened to it.

16   It never got back to Mr. St. Surin, obviously.

17        THE COURT:  Well, because he was in jail.

18        MR. SWAINE:  That's correct.

19        THE COURT:  Well, the Second Circuit instructs me

20   under this guideline in the case of the United States versus

21   Aregbeyen that I must afford the defendant opportunity to

22   present evidence of his inability to pay a fine, and I am now

23   affording you that opportunity.

24        MR. SWAINE:  Yes, your Honor.  In order to meet that

25   obligation, Mr. St. Surin would rely on the affidavit

**EXHIBIT A**

1  submitted to the Court in order to obtain counsel under the

2  Criminal Justice Act.

3          THE COURT:  Okay.

4          MR. SWAINE:  I believe, with all due respect, that

5  that does meet his burden.

6          THE COURT:  It meets his burden of establishing that

7  he can have counsel to represent him because he can't afford

8  counsel to represent him.  Clearly having assets of $9400,

9  insufficient to pay a retainer let alone to pay an entire fee

10  to represent someone in a case of this sort.  Therefore, given

11  he was in custody and had no income, the finding of indigence

12  for purposes of appointment of counsel was well established.

13          However, I have him as having an asset worth, two

14  years ago, $8500 but clearly, I would think, worth at least

15  $5,000 today and I have no evidence that he doesn't have

16  control over that asset or the proceeds of that asset.  It was

17  in his name, he's entitled to it, he owns it.

18          So on the face of the affidavit in front of me, even

19  in the absence of the defendant's willingness to provide

20  further evidence of indigence or inability to pay a fine,

21  shall we say is a better way to frame it at this stage, I have

22  evidence in front of me that he had an asset worth $8500 in

23  2001.

24          MR. SWAINE:  Your Honor, just, I am aware of that

25  and I hear what the Court is saying.  I would just refer to

**EXHIBIT A**

1  paragraph 55 of the presentence report, which is what the

2  guideline range for applying is.

3      THE COURT:  Right, but I could depart downward from

4  that and still impose a fine.

5      MR. SWAINE:  I understand.  We start off with

6  significantly more than he ideally would have if everything

7  were intact and still of value.

8      THE COURT:  Section 5E1.2 of the guidelines provides

9  I must impose a fine in all cases, except where the defendant

10  establishes that he's unable to pay and not likely to be able

11  to pay a fine, and the burden is on the defendant to show

12  inability to pay, United States versus Sasso, 59 F.3d 341,

13  342, Second Circuit, 1995.  "The Court is not required to

14  accept a defendant's unsubstantiated claim of penury and is

15  entitled to reject such a claim when he refused to cooperate

16  with the probation department in exploring his resources."

17  That's id at Sasso at 352.

18      A District Court must afford, as I said, an

19  opportunity to present evidence of his inability to pay.

20  However, our case law has recognized "that the defendant bears

21  the burden to show indigence that would avoid imposition of a

22  fine.  Obviously, once indigence has been established,

23  discretion vested in the District Court to waive a fine should

24  generally be executed in favor of such a waiver, U.S. versus

25  Corace 146 F.3d at 56, Second Circuit, 1998:

**EXHIBIT A**

1          "We previously held the defendant may satisfy his

2    burden by independent showing or reference to his presentence

3    report objective evidence of inability to pay such as

4    representation by assigned counsel, obviously strengthened

5    defendant's claim of financial inability."

6          Lastly, in United States versus Sasso, the circuit

7    found that when a defendant was not forthcoming with respect

8    to his financial circumstances, it's, "well within the

9    province of the District Court to find he has not carried his

10   burden of proving inability to pay."  59 F.3d at 352.

11         While I appreciate the fact that the defendant is in

12   the situation where he wishes to preserve his right to silence

13   and his right to press his appeal on a claim of innocence,

14   nonetheless, I have to decide about sentence based upon the

15   record before me, and the Court is concerned about that record

16   because while defendant qualified for appointment of counsel,

17   there is an indication of an asset which the defendant had at

18   the time he was arrested, in the form of an expensive

19   motorcycle.

20         The Court notes that the sentencing guideline range

21   for the fine begins at $25,000.  Obviously that asset is not

22   sufficient to pay that fine.  However, the Court is going to

23   depart downward from the guideline range and determine that

24   the defendant is able to pay a fine of $5,000 based upon his

25   ownership of the asset in the motorcycle.

**EXHIBIT A**

1        And that the fact the defendant does not have

2  physical custody of the motorcycle currently doesn't mean, or

3  at the time of 2001 doesn't mean, he doesn't have the right to

4  it or the proceeds to be derived from the sale of it.

5        Further, the defendant is going to be in custody

6  with the Bureau of Prisons for a number of years and

7  certainly, while I haven't done the math to determine, and I

8  doubt very much that that alone would be sufficient to allow

9  him to work off a fine of $5,000, the Court finds that the

10  combination of his ability to do so through the Inmate

11  Responsibility Act I guess is what it's called.

12        MR. LOPEZ:  Inmate Financial Responsibility Program.

13        THE COURT:  Inmate Financial Responsibility Program,

14  that through that as well as the proceeds from the sale of the

15  motorcycle he owns should be sufficient to permit him to pay a

16  fine of $5,000.

17        The Court will waive any interest on that fine.

18        The Court will impose such a fine.

19        At this time, Mr. St. Surin, I would ask you if you

20  would please rise.  The Court's going to impose sentence.

21        It is the determination of this Court to impose upon

22  you a sentence of 188 months, followed by a term of supervised

23  release of -- is it still five years is the minimum?

24        MR. LOPEZ:  Yes, your Honor.

25        THE COURT:  -- five years.  The Court, as I've said,

**EXHIBIT A**

1  has departed from the guideline range on the fine and imposed

2  a fine of $5,000 with no interest to accrue, and I must impose

3  a special assessment of $100.

4          In connection with your term of supervised release,

5  the Court imposes the obligation to pay off any unpaid portion

6  of your fine at the rate of 10 percent of your gross earnings,

7  or $100 a month, whichever is greater.  That's subject to

8  alteration should conditions be such that you are unable to

9  make any such payment.

10         In addition to the standard conditions of supervised

11  release, with the exception of third-party notification, the

12  Court imposes the following special condition:

13         If you are deported from the United States after

14  your release from custody, the defendant shall not reenter the

15  United States without the prior written approval of the United

16  States Attorney General and notification of the United States

17  Attorney's Office and the United States Probation Office for

18  the District of Connecticut.

19         Do I have to require that he participate in the

20  Inmate Responsibility Program or will that be automatic?

21         MR. LOPEZ:  You can make the recommendation, your

22  Honor, but for him to be incarcerated with an outstanding

23  fine, they would automatically instruct him to do so.

24         THE COURT:  All right.  Well, it's my recommendation

25  to the Bureau of Prisons that the defendant be obligated to

**EXHIBIT A**

1    begin the payment of his fine through participation in the

2    Inmate Responsibility Program.

3          Before I formally impose that fine upon Mr. St.

4    Surin, is there any objection to the sentence?  I know I need

5    to articulate my reasons for it, I'll do that in a moment, and

6    need to advise him about appeal.  As to the sentence itself,

7    is there anything unlawful about it, for example --

8          MR. SPEARS:  No, your Honor.

9          THE COURT:  No?  All right.  Is there anything you

10   would ask me, Attorney Swaine, by way of recommendations to

11   the Bureau of Prisons or anything else that you would have me

12   add to that sentence?

13         MR. SWAINE:  Yes, just that a recommendation that he

14   be placed on the East Coast in closer proximity to his family.

15         THE COURT:  The Court will make that recommendation

16   to the Bureau of Prisons, that he be located as close to

17   southern Connecticut as the Bureau of Prisons can accommodate.

18         I do need to make a finding on the record because

19   the guideline range of 151 to 188 exceeds 24 months.  The

20   Court determined to sentence you, Mr. St. Surin, at the top of

21   the guideline range for really two reasons:

22         Certainly, the record as a whole informed my

23   decision so I don't mean to solely point out these, but I'm

24   going to use these in particular to explain why I decided to

25   sentence you at the top of the range.

**EXHIBIT A**

1          First, I think that the quantities that have been

2   found by the Court for purposes of guideline calculation are

3   very conservative.  I have in front of me a defendant, you,

4   Mr. St. Surin, who seems to be employed on a part-time on and

5   off basis for the three-and-a-half to four years that we

6   particularly focused in this case and in my sentencing, from

7   '98 to mid-2001.

8          Although your wife told the probation officer you

9   worked for Prime Time for four to five years, they only

10  evidenced one year, and that was on a part-time basis or on

11  and off.

12         The other company you identified, you said was for

13  one year in '99 on a part-time basis or -- or full-time,

14  excuse me.  That leaves us with a lot of time when you were

15  not gainfully employed but clearly supporting yourself, and

16  the Court infers from that that you were employed in regular

17  and significant drug dealing and that the quantities involved,

18  as I say, I used the most conservative numbers to calculate

19  quantities involved here.

20         For example, on the crack cocaine, I believe that

21  you actually purchased 187 grams, not 127.  I believe that the

22  quantities involved are in excess of eleven kilograms.  If I

23  draw reasonable inferences from all the telephone

24  conversations and the intensity of the numbers of

25  conversations between yourself and Mr. Weldon, while the Court

**EXHIBIT A**

1  did not use those quantities in determining the guideline

2  range, I think I could have and therefore, I think it's

3  appropriate to consider that quantity is likely very

4  conservative, number one;

5      Number two, it's not at the bottom even of the range

6  for 34, that would be -- I get this wrong every time -- 3,000

7  kilograms of marijuana is the bottom of the range of level 34,

8  whereas even under the conservative calculations we were in

9  the mid four thousands of kilograms.

10      In addition, the Court is also -- and I understand,

11  Mr. St. Surin, you insist upon your innocence and if you are

12  correct, I hope that you are successful on appeal because I

13  have no desire to have to sentence a person who is innocent.

14      However, I have to sentence you today based upon the

15  record that's in front of me, and that although I chose not to

16  although it was my conclusion, and I have to tell you it was a

17  difficult decision because of the absence of guidance in the

18  commentary, the absence of guidance in the case law, and the

19  peculiar facts involved of type of drug and the more onerous

20  penalty arising downstream as opposed to most of the examples

21  being the onerous penalty arising from the upstream, at the

22  upstream level, that it was not an easy decision, but I

23  determined that on a preponderance of the evidence basis, I

24  was not persuaded that there was enough in the record for me

25  to conclude that you, in effect, were responsible for Weldon's

**EXHIBIT A**

1  conversion actions because you had, in effect, jointly

2  undertaken activities with him to that effect.

3         However, it doesn't mean that I'm blinded to the

4  fact that you were well aware of what he was doing, that he

5  was moving large quantities of crack cocaine, certainly

6  beginning in 2000, onto the streets of Norwalk through the

7  Burdens and that while I did not hold you responsible, in

8  effect, for that, I think the government's word was culpable

9  for that, in the calculation of the guidelines, I think it's

10  fully appropriate, particularly given your knowledge of that

11  being what was happening, that I use it as a reason to hold

12  you responsible in terms of where I sentence you under the

13  guideline range.

14         And for those reasons, the Court determined to

15  sentence you at the top of the guideline range.

16         Mr. St. Surin, I need to advise you, obviously

17  you've talked about appeal with Attorney Swaine and I'm sure

18  you will talk more with him, but I need to be certain on the

19  record that you understand your rights in that respect.  You

20  obviously have the right to appeal your conviction, that is

21  the finding of guilt by the jury and my refusal to set it

22  aside.

23         You also have the right to appeal with respect to

24  issues of sentencing, what I've done here today, what findings

25  I've made or not made.

**EXHIBIT A**

1          I'm sure Attorney Swaine would continue to try to

2    assist you in that respect but even if he were to say, I don't

3    want to help you anymore, you can file your own notice of

4    appeal.  It's a very simple piece of paper, saying "I appeal,"

5    and there is a filing fee that you have to pay but if you

6    can't pay it, the clerk will take that notice and help you in

7    filing it without the payment of the fee.  In other words, the

8    clerk will waive the fee.

9          The important thing that I need to be certain that

10   you understand, though, Mr. St. Surin, is that the right to

11   appeal lasts for only a very brief period of time.  In effect,

12   ten days from today, if you have not appealed, you will lose

13   your right to appeal forever, all right?

14         So that means that you must file a notice of appeal

15   within ten days of today, if you wish to appeal anything about

16   what happened during the trial or anything that happened here

17   today or anything that happened at all in connection with your

18   case, it must be done within the next ten days, received in

19   the clerk's office.  So I want to be certain that you

20   understand that because it's very important.  Do you

21   understand that, Mr. St. Surin?

22         THE DEFENDANT:  (Nodding head.)

23         THE COURT:  All right.  Is there anything further

24   that the Court has to attend to?

25         MR. SPEARS:  Nothing from the government, your

**EXHIBIT A**

1    Honor, thank you.

2          THE COURT:  All right.  I believe that completes the

3    sentencing for today, then, of Mr. St. Surin.

4          (12:28 o'clock p.m.)

5

6

7

8

9

10

11

12

13

14

15

16          COURT REPORTER'S TRANSCRIPT CERTIFICATE

17

18          I hereby certify that the within

19    and foregoing is a true and correct transcript

20    taken from the proceedings in the above-entitled

21    matter.

22

23          _____

24                   Official Court Reporter

25    Dated:  _____

**EXHIBIT A**